882 P.2d 933

STATE of Arizona, Appellee,

v.

Claude Eric MATURANA, Appellant.

No. CR–92–0202–AP.

Supreme Court of Arizona, En Banc.

Oct. 13, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, Jon G. Anderson, Phoenix, for appellee.

Harriette P. Levitt, Tucson, for appellant.

OPINION

MOELLER, Vice Chief Justice.

## STATEMENT OF THE CASE

On February 26, 1992, defendant, Claude Eric Maturana, was convicted by a jury of first degree premeditated murder for the July 6, 1990 killing of Glenn Estes, a 16–year–old boy in Tucson. The trial court sentenced defendant to death. This is an automatic, direct appeal. A.R.S. § 13–4031; Rules 26.15 and 31.2(b), Ariz.R.Crim.P. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, 13–4033, and 13–4035.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of July 6, 1990, the body of the 16–year–old victim, Glenn Estes, was found in a water tank in a remote desert area outside Tucson. The victim had suffered multiple gunshot wounds to his head and chest and machete wounds to his neck and upper body. Upon arriving at the crime scene, the police immediately found evidence linking defendant to the scene—namely, a receipt with defendant's name and signature on it. Later that afternoon, the boy's mother reported her son missing. The sheriff's department questioned her about her son and later identified him as the murder victim.

That same evening, police located and stopped defendant and co-defendant, Stephen Ballard, for questioning. After reading them their *Miranda* rights, officers from the sheriff's homicide unit interviewed the two suspects in adjacent police cars, where the two could see but not hear each other being questioned.

During the interview, defendant repeatedly changed his story. First, he told the police that he had dropped Glenn off at his house at 2:00 a.m. and that he knew nothing about the murder. When confronted with evidence that he had been at the scene of the crime, however, he admitted that he and the co-defendant had driven Glenn out to the desert area but claimed that they left after Glenn and another man, Robert Murray, began arguing (defendant admitted later that he

made up the name of this nonexistent participant). Eventually, defendant admitted being present when Glenn was killed, though he denied any participation. The police arrested both defendant and Ballard.

Defendant had two rifles and a machete in his trunk at the time of his arrest, all of which had traces of human blood on them. A criminalist testified at trial that some of the casings and bullet fragments found at the murder scene were fired from one of the rifles. He also testified that some of the bullets retrieved from Glenn's body had characteristics consistent with this rifle. Blood found in several locations in defendant's car was consistent with the victim's blood but not with defendant's or co-defendant's blood. Defendant's and co-defendant's fingerprints were found on beer and soda cans left at the murder scene.

Further investigation revealed that in May 1990, several weeks before his murder, Glenn had falsely told defendant and Ballard that an acquaintance, Rick Ulibarri, had stolen an intake manifold from them (defendant worked at and owned a junkyard/auto-repair operation). Angered by this news, defendant and Ballard sought out Ulibarri. When they found him, both defendant and Ballard beat him, and defendant stabbed him. Approximately three weeks after this incident and several weeks prior to the murder, defendant and Ballard learned that Glenn, not Ulibarri, had in fact stolen the manifold and that Glenn had lied to the two men about Ulibarri's involvement.

After his arrest, defendant bragged about the murder to another man in custody, Peter Stevens.[1] Defendant graphically described to Stevens how he and a friend had killed a boy by shooting him 14 times in the head and chest with a .22 caliber rifle and how they had used a machete "to make sure this fucker's dead." Defendant expressed no remorse for his actions. Rather, he proudly explained to Stevens that he killed the boy because he was a "snitch" and a thief and because "his number was up." Defendant described to Stevens how he fooled the boy into going out

in the desert to "party." He described in detail to Stevens how the boy had thrown his hands up and screamed when he "saw it coming," how the boy screamed and how his body shook after each successive gunshot, and how he had fooled the police into thinking a fictional person (i.e., Robert Murray) had committed the crime.

Defendant's defense at trial was mere presence—he claimed that Stephen Ballard alone had killed Glenn. Defendant admitted that he helped Ballard put the body into the water tank, but denied that he participated in the killing itself. He admitted that he and Ballard were on their way to dispose of the weapons when the police stopped them, but he denied ever using the weapons. He admitted previously stabbing Ulibarri (thinking Ulibarri had stolen the manifold), but he denied that he was angry at Glenn when he learned Glenn was the real thief of the manifold. He admitted lying repeatedly to the police during the initial interviews (e.g., claiming he never was at the murder scene, making up the name Robert Murray, etc.), but he explained that he did so only to protect his friend, Ballard. Finally, he denied ever bragging about the killing to Peter Stevens; he could not, however, explain how Stevens knew about many of the exact details of the crime (e.g., the attempt to cut the victim's head off with a machete, repeatedly shooting the boy with a .22 caliber rifle, dumping the body in a water tank, etc.) when Stevens had never before heard about the killing.

In separate jury trials before the same judge, defendant and his co-defendant Ballard were both convicted of first degree murder. The trial court, after making detailed, specific, and comprehensive findings in its special verdict, sentenced defendant to death. The trial court found two statutory aggravating factors: that the murder was committed in an especially cruel, heinous or depraved manner, A.R.S. § 13–703(F)(6); and that defendant had been previously convicted of a violent crime, A.R.S. § 13–703(F)(2). The trial court found no mitigating factors suffi-

---

1. Stevens was in custody on a domestic violence charge, which was later dropped. He made a statement to the police and testified at trial not as part of any plea bargain, but because he said he thought defendant was a "sick" man.

ciently substantial to call for leniency. Ballard was sentenced to life imprisonment.

## ISSUES

Defendant's brief presents the following issues:

## I. TRIAL ISSUES

A) Whether the trial court erred in finding that defendant's statements to the police were voluntary and admissible pursuant to Rule 801(d)(2), Ariz.R.Evid.

B) Whether the trial court erred in admitting evidence of a prior bad act, namely defendant's stabbing of Rick Ulibarri.

C) Whether the trial court erred in admitting testimony that the police had obtained a taped statement from co-defendant Stephen Ballard.

## II. SENTENCING ISSUES

A) Whether the record supports the trial court's finding that this murder was committed in an especially cruel, heinous or depraved manner. A.R.S. § 13–703(F)(6).

B) Whether the record supports the trial court's finding that defendant had previously been convicted of a violent felony. A.R.S. § 13–703(F)(2).

C) Whether the trial court erred by not finding as a mitigating circumstance that co-defendant, Stephen Ballard, received a life sentence.

D) Whether the record supports the trial court's finding that defendant was the "planner" of the murder and that co-defendant, Ballard, was responding to his directions.

## III. EFFECTIVE ASSISTANCE OF COUNSEL

A) Whether defendant was denied effective assistance of counsel.

## ANALYSIS

## I. TRIAL ISSUES

### A. Admitting Defendant's Statements to the Police into Evidence

Defendant argues that the trial court improperly admitted into evidence his statements to the police because they were involuntary under the totality of the circumstances and they do not qualify as confessions under Rule 801(d)(2), Ariz.R.Evid. We disagree.

Defendant contends that his statements to the police were involuntary because the police used an improper psychological ploy in questioning the two suspects in adjacent cars where the two could see but not hear each other being questioned and because the police "repeatedly grilled him" when he remained silent to many of their questions. After a voluntariness/*Miranda* hearing, the trial court disagreed, finding that defendant's statements to the police were voluntary. We will not disturb the decision of the trial court absent clear and manifest error. *State v. Amaya–Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

The trial court did not commit clear and manifest error in determining that defendant's statements to the police were voluntary. The record shows that, before questioning defendant, the police read him his rights. Defendant stated that he understood his rights and that he did not stop the interview or request a lawyer. When defendant failed to answer specific questions, the detective went on to other questions. The length of the interview was reasonable under the circumstances (approximately 2 hours). Moreover, there is no evidence that the police used any promises or threats to get defendant to talk.

Simply questioning the two suspects in adjacent cars where the two could see but not hear each other was not improper in and of itself; rather, it was an effective and appropriate questioning technique under the circumstances. *See, e.g., State v. Carrillo*, 156 Ariz. 125, 136, 750 P.2d 883, 894 (1988) (the police cannot be expected to give up all tactical questioning devices, only those designed to overcome a suspect's will). It is not wrong to outsmart a suspect—it is wrong to compel. *Id.* There is no evidence in the record that the police did anything improper to compel defendant to talk.

■ Defendant also contends that his statements to the police should not have been admitted pursuant to Rule 801(d)(2), Ariz. R.Evid., because they were not "confessions," *i.e.*, they were not "admissions tending to prove the facts or circumstances relating to his guilt." He points out that his statements to the police consisted in part of silence in response to the detective's questions. Defendant misapplies Rule 801(d)(2). For one, his *answers* to the detective's questions were certainly admissible as relevant statements by a party opponent. *See, e.g., State v. Atwood*, 171 Ariz. 576, 619, 832 P.2d 593, 636 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). We have never required that a defendant's statement be a full "confession," however the term is defined, to be admissible. His statement need only be relevant and be offered against him. *Id.* Defendant's statements to the police regarding his whereabouts and actions on the day of the murder were clearly relevant. Moreover, many of his statements would have been admissible independently as impeachment during or after defendant's trial testimony.

■ Similarly, the trial court did not err in permitting Detective Petropoulis to testify that defendant remained silent in response to some of his questions. Defendant argues that this constitutes an improper comment on his right to remain silent as prohibited by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Defendant, however, never invoked his right to remain silent—he merely chose to answer some questions and remain silent as to others. Indeed, he chose to do so after being read his rights and stating that he understood them. *See, e.g., State v. Lundstrom*, 157 Ariz. 485, 487, 759 P.2d 631, 633 (App.1988), *rev'd on other grounds*, 161 Ariz. 141, 776 P.2d 1067 (1989) (defendant's response that he "can't talk now" did not invoke his right to remain silent when, after being given period of time to collect himself and again being read his rights, he chose to answer questions). Because defendant did not invoke his right to remain silent, there is no *Doyle* violation.[2] The trial court, thus, did not commit clear and manifest error in admitting defendant's statements.

### B. Admitting Evidence of a Prior Bad Act

■ Defendant argues that the trial court improperly admitted evidence of a prior bad act—namely, his stabbing of Rick Ulibarri. He contends the evidence was admitted and used only to show that he had a criminal and violent nature and that he acted in conformity therewith on the night of the murder. Rule 404(b), Ariz.R.Evid. We disagree.

As the state points out, admitting evidence of defendant's stabbing of Ulibarri was clearly relevant to show motive and intent. It tends to establish that defendant had a motive to harm or kill Glenn because it shows that defendant was sufficiently upset over the theft of the manifold that he had assaulted Ulibarri when he thought Ulibarri was the guilty party. It establishes possible intent to kill Glenn because it shows defendant might want to take revenge on whomever he believed took the manifold.

Additionally, we note that this evidence ultimately would also have been admissible to rebut defendant's defense of mere presence. That defendant and Ballard intended to find and hurt whomever they believed took the manifold demonstrates that they planned to and would act together to punish whomever took it.

Thus, we believe the evidence of defendant's previous stabbing of Ulibarri was admitted for a relevant purpose and not to show that defendant was a bad or violent person. The trial court did not abuse its discretion in admitting this evidence.

---

2. Defendant also argues, in the alternative, that the trial court erred by admitting into evidence the tapes of the interviews with defendant containing the periods of silence. He argues that the trial court should have redacted the periods of silence from the tapes of the interview admitted at trial. Defendant did not, however, request that the trial court redact the tapes to exclude the periods of silence, nor did he object to the admission of the unredacted tapes *qua* unredacted tapes. Thus, defendant has waived this argument.

### C. Admitting Testimony That the Police Obtained a Statement from Co-Defendant, Stephen Ballard

Defendant argues that the trial court improperly admitted testimony that police officers obtained a statement from co-defendant Ballard during the time between defendant's first and second statements. Although the jury never heard what Ballard said,[3] defendant argues that the testimony left an inference with the jury that Ballard had confessed to the crime, which, in turn, motivated defendant to change his story in the second statement. Defendant contends, therefore, that his conviction was improperly based upon the uncorroborated testimony of an accomplice. *State v. Gomez,* 102 Ariz. 432, 432 P.2d 444 (1967). We disagree.

■ Defendant did not object to this testimony at trial, so he has waived this argument absent fundamental error. *State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). We fail to see how this testimony—even assuming it was admitted erroneously—could rise to the level of fundamental error. The prosecutor made only a passing reference to Ballard's statement. The jury did not hear what Ballard said to the detective; indeed, the prosecutor expressly told the witness not to relay what Ballard had said. Moreover, even if this testimony left an inference with the jury that Ballard had confessed, this would seem to buttress defendant's trial defense of mere presence. The trial court did not commit fundamental error in failing to sua sponte declare a mistrial.

## II. Sentencing Issues

■ This court has a duty to independently review the existence of aggravating and mitigating circumstances and to ensure that the death penalty is only imposed in appropriate cases. *State v. Fulminante,* 161 Ariz. 237, 254, 778 P.2d 602, 619 (1988), *aff'd,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302

(1991). Defendant argues that the trial court erred in finding that this murder was committed in an especially cruel, heinous, or depraved manner, A.R.S. § 13–703(F)(6), and that he had previously been convicted of a crime of violence, A.R.S. § 13–703(F)(2). He also claims that the court erred by failing to find the existence of mitigating factors sufficiently substantial to call for leniency. Finally, he argues that the record fails to support the trial court's conclusion that he was the planner and driving force behind the murder. We address each issue in turn.

Fortunately, in this case, the trial court rendered a detailed and comprehensive special verdict, which fully complies with the specificity requirements of A.R.S. § 13–703(D) with respect to statutory aggravating and mitigating circumstances and also complies with existing case law concerning recommended procedures on nonstatutory mitigating factors. *See, e.g., State v. Hill,* 174 Ariz. 313, 330, 848 P.2d 1375, 1392, *cert. denied,* — U.S. ——, 114 S.Ct. 268, 126 L.Ed.2d 219 (1993); *State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

### A. Aggravating Factors
#### 1. Cruel, Heinous, or Depraved

Defendant contends that this murder was not especially cruel because there was no evidence that Glenn suffered an unusual amount of pain or anguish during the attack. We disagree.

■ The trial court's detailed findings (Appendix A) that Glenn was made to suffer physical pain and mental anguish are amply supported by the record. *State v. Amaya–Ruiz,* 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). The record shows that Glenn was conscious during much,

---

**3.** Defendant did not provide us with a citation to the record where this alleged error took place. We assume he is referring to the following testimony:

> Q [prosecutor]: Now, had you between the first statement and the one that we just listened to you [sic], had you gone to the car next to this one and talked to Mr. Ballard at all?

> A [detective]: Yes, sir.
> Q [prosecutor]: And did you actually, without going into detail about what was said, did you actually tape record the statements from Mr. Ballard?
> A [detective]: I did.

if not all, of this brutal attack. *Id.; State v. Lopez*, 163 Ariz. 108, 115, 786 P.2d 959, 966 (1990). A pathologist testified that one of the wounds to Glenn's forearm could be considered a defensive wound to the gunfire. Defendant bragged to Stevens about how Glenn had thrown up his hands and screamed when he "saw it coming" and how he "was shaking" and screaming for defendant to stop after each successive gunshot. The pathologist also testified that another wound on Glenn's hand could be considered a defensive wound suffered during the machete attack. Thus, the state proved beyond a reasonable doubt that Glenn suffered physical pain and endured mental anguish during this attack. This murder was especially cruel.

Proof of cruelty alone is sufficient to establish an aggravating factor under section 13–703(F)(6). We will nonetheless address defendant's argument that we should set aside the trial court's findings concerning heinousness and depravity. In *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), this court set forth a five-part test to determine whether a murder was especially heinous or depraved within the meaning of A.R.S. § 13–703(F)(6). We agree with the trial court's findings concerning heinousness and depravity set forth in Appendix B.

■■■ Defendant relished this killing. He bragged to Stevens about "how great it was." He never showed any signs of remorse. He proudly described to Stevens how he had fooled Glenn into accompanying him and Ballard into the desert to party and how he had made Glenn pay for being a snitch and a thief.

This murder also most definitely involved gratuitous violence and needless mutilation. Defendant shot Glenn at least 12 times in the head and chest. Several shots were from very close range, allowing some bullets to cause multiple entrance wounds. Defendant watched as Ballard repeatedly hacked the body with a machete to "make sure this fucker's dead." One machete wound nearly severed Glenn's jugular vein. There was an apparent attempt to sever the body's head before dumping it in the water tank. Defen-dant and Ballard then dragged the body over to and dumped it into a rancher's well in a remote area of the desert outside Tucson.

Thus, without even considering the element of "senselessness" referred to in *Gretzler*, we agree with the trial court that this murder was especially heinous and depraved.

## 2. Previous Conviction for a Crime of Violence

As another aggravating factor, the trial court found, pursuant to A.R.S. § 13–703(F)(2), that defendant had been previously convicted of a crime of violence—namely, an aggravated assault in Texas. At the sentencing hearing, the state offered certified copies of defendant's indictment, plea agreement, and judgment on plea of guilty as proof that he had been previously convicted of stabbing another person with a homemade spear. Defendant argues this was insufficient—that the state failed to prove beyond a reasonable doubt that he had been previously convicted of the offense because it did not offer a certified record of his conviction.

We do not understand defendant's contention that the state failed to introduce a certified copy of his aggravated assault conviction. As Exhibit 1 at the hearing, the state introduced a certified "Judgment on Plea of Guilt," which indicated that, pursuant to a plea, the court found defendant guilty of aggravated assault. This is a certified copy of conviction, and we find no error.

## B. Mitigating Circumstances

■■■ Defendant argues that because his co-defendant received a life sentence, the trial court should have considered that factor sufficiently mitigating to reduce defendant's sentence to life. The trial court disagreed, and so do we.

The record supports the trial court's finding that there was a sufficient disparity in culpability between defendant and Ballard to warrant a death sentence for the former and life for the latter. Defendant initiated the attack—he shot the victim multiple times before Ballard attacked the dying boy with the machete. Defendant was 32 years old at the time of the crime. Ballard was only 20.

There was significant evidence that defendant planned the whole affair, enlisted the support of Ballard, and ensured that Ballard participated. Defendant committed this crime while on parole from Texas for three prior felony convictions, one of which was the violent assault previously discussed. The trial court did not err by not finding Ballard's life sentence to be a mitigating circumstance.

This court also independently weighs mitigating evidence. Here again, the trial court made detailed findings. *See* Appendix C. We have reviewed them in light of the record and adopt them as our own.

### C. Trial Court's Finding That Defendant Was the Planner and Driving Force Behind the Murder

▮ Defendant argues that the trial court erred in its finding that defendant was the planner of the murder and that co-defendant Ballard was merely responsive to defendant's directions. He claims the record is inconclusive regarding who was the planner and leader as between defendant and Ballard. He asserts that indeed Ballard may have been the planner and shooter.

Although this argument is presented separately, we perceive it as related to defendant's argument that there is an impermissible disparity between defendant's sentence and Ballard's sentence. We first note that this is not a felony murder case. Defendant was charged, tried, and convicted entirely upon a premeditated murder theory. Thus, he premeditated. In any event, the trial court's finding that defendant was the principal player in the tragedy is amply supported by the record. Defendant admitted to the detective that there was only one shooter (although he then claimed it was Robert Murray), he bragged to Stevens how he had fired the .22 rifle multiple times, and he proudly described to Stevens how he had plotted the murder, *i.e.*, by fooling the victim into believing they were going out to the desert to party. The trial court noted the age disparity between defendant (32) and Ballard (20) and Ballard's receptiveness to defendant's instructions. The trial court did not err in finding that defendant was the

planner and driving force behind this murder.

### III. Effective Assistance of Counsel

▮ Defendant argues he was denied effective assistance of counsel. This court will not resolve an ineffective assistance of counsel claim on direct appeal unless the record clearly indicates that the claim is meritless. *State v. Atwood*, 171 Ariz. 576, 599, 832 P.2d 593, 616 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). Given the nature of the claim and the record before us, we are not prepared to reject the claim as clearly meritless at this point. If defendant wants to pursue this argument, he must raise it in an appropriate post conviction relief proceeding under Rule 32, Ariz. R.Crim.P. Because we are affirming defendant's conviction and death sentence, such a petition will be filed automatically on defendant's behalf. *See* Rule 32.4(a), Ariz. R.Crim.P.

### DISPOSITION

Defendant has presented no reversible error in either the guilt or sentencing phase. Pursuant to A.R.S. § 13-4035, we have independently reviewed the record for fundamental error and have found none. Defendant's conviction and sentence are affirmed.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

### APPENDICES

Trial Court's Special Verdict, Excerpted (Minute Entry, May 19, 1992, at 5–7, 8–14)

### APPENDIX A

The offense was especially cruel because Glen Estes was made to suffer physical pain and endure the severe mental anguish associated with his uncertainty as to his fate during the course of events which took place on or about July 6, 1990.

The Court finds beyond a reasonable doubt that Glen Estes was alive and conscious during at least some portion of the assault which

lead to his death. This finding is based on the testimony at trial that clearly establishes that Glen Estes was shot numerous times and then assaulted with a machete. The evidence also established that Glen Estes suffered a defensive wound to his hand which clearly indicates that he was attempting to resist the machete assault prior to his death. It is the finding of the Court that the victim suffered tremendously, both physically and mentally, during that period of time, however brief, between the infliction of the first gunshot wound and his death, which must have occurred sometime after the beginning of the machete assault. The Court finds that there was a period of time when Glen Estes was uncertain as to his fate and was suffering physically.

### APPENDIX B

The Court further finds that the offense was committed in an especially heinous and depraved manner. This finding is based upon evidence, beyond a reasonable doubt, of the following:

1. The defendant relished the act of killing as demonstrated by the testimony of Pete Stevens. Mr. Stevens testified at trial that after Mr. Maturana killed Glen Estes he bragged to Mr. Stevens about how Glen shook each time he fired another round into his body. The defendant also bragged to Mr. Stevens about how Glen was stupid to have fallen for the idea that they were going to this remote desert area to party. Mr. Stevens described how the defendant showed no remorse and seemed to enjoy not only the act of killing, but also talking about it.

2. That the defendant, together with his co-defendant, inflicted gratuitous violence upon the person of Glen Estes. This finding is based upon the evidence which clearly establishes that there were ten to twelve gunshot wounds upon the person of Glen Estes, at a minimum, and the evidence which also establishes that Glen's body was hacked at with a machete prior to being disposed of in the cattle watering tank.

3. That the body of Glen Estes was mutilated by the machete assault since the evidence clearly establishes that there was an apparent attempt to cut off Glen Estes' head prior to placing him in the watering tank.

### APPENDIX C

The Court has considered all those mitigating circumstances set forth in A.R.S. § 13–703(G), as well as any and all other testimony offered by the defendant in mitigation, including evidence and testimony that does not specifically establish or speak directly to any of the mitigating circumstances set forth by statute. Specifically, the Court finds as follows:

1. Although the defendant has argued that he spent in excess of two years at the Norwich State Hospital as part of treatment for alcohol, cocaine and marijuana abuse, the Court finds that the defendant has failed to establish, by a preponderance of the evidence that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. Whether or not the defendant may have suffered from alcohol, cocaine or marijuana abuse, there is no evidence in this record to suggest that the use or abuse of any of these drugs or alcohol contributed to the defendant's conduct in causing the death of Glen Estes.

2. The Court further finds that the defendant has failed to establish by a preponderance of the evidence that he was under unusual and substantial duress, although not such as to constitute a defense to prosecution. The Court specifically finds that any evidence suggesting that the defendant may have been acting at the direction of Stephen Ballard or that Stephen Ballard and not the defendant was primarily responsible for causing the death of Glen Estes is inherently unbelievable. The Court specifically rejects any of this testimony and any argument in support of this mitigating circumstance.

3. The Court further finds that the defendant has failed to establish by a preponderance of the evidence that he was legally accountable for the conduct of another un-

der the provisions of A.R.S. § 13–303, but that his participation was relatively minor, although not so minor as to constitute a defense to prosecution. Although this defendant is surely accountable for the conduct of Stephen Ballard, it cannot be said that this defendant's participation was relatively minor. In fact, the Court finds beyond a reasonable doubt that it was this defendant's conduct and planning that resulted in the murder of Glen Estes.

4. The Court further finds that the defendant has failed to establish by a preponderance of the evidence that he could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person. To the contrary, the Court specifically finds beyond a reasonable doubt that causing the death of Glen Estes was exactly what the defendant intended to do and further finds that this defendant fired no less than ten to twelve rounds into the body of Glen Estes thereby causing his death.

5. The Court further finds that the defendant has failed to establish by a preponderance of the evidence that his age should constitute a mitigating circumstance. This defendant is an adult male over thirty years of age.

The Court finds that the defendant has failed to establish any statutory mitigating circumstance by a preponderance of the evidence. The defendant has also requested the Court to consider in mitigation that his parents died when he was only fourteen years of age. The defendant has also asked this Court to consider the fact that his father was an alcoholic, was abusive towards the defendant and his mother, and that the defendant, following the death of his parents, lived essentially on his own and was forced to support himself without assistance from even a foster family. The defendant also urges this Court to find in mitigation that the defendant has a long history of drug abuse and addiction. Also in mitigation the defendant states that he has a long history of alcohol abuse and addiction.

The defendant also asks this Court to find in mitigation that he has served in the United States Air Force and received an Honorable Discharge. Furthermore, the defendant asks this Court to find in mitigation that the defendant is remorseful. The defendant also offers in mitigation that at the time of the offense he was married and the father of his son. The defendant argues that his execution would have a detrimental effect on the emotional well being of his son. The defendant also argues in mitigation that while incarcerated he has a new-found set of religious beliefs and values and during his incarceration he has been a well-adjusted prisoner.

The defendant also offers in mitigation that his verbal abilities suggest that he has an average to low average I.Q. and only obtained a tenth grade education.

Finally, the defendant asks this Court to find in mitigation that the co-defendant received a life sentence rather than the death penalty.

The Court has considered each of the offered mitigating circumstances individually and collectively. The Court has also considered whether these circumstances of mitigation might individually, or collectively, constitute a statutory mitigating circumstance. Although the Court has concluded that they do not, the Court specifically finds that even in the event that this evidence would establish one or more of the statutory mitigating circumstances, the Court specifically finds that these circumstances of mitigation, whether taken individually or collectively, and whether they qualify as statutory mitigating circumstances or non-statutory mitigating circumstances, or a combination thereof, are not sufficiently substantial to call for leniency in this case.

Although the Court has found the existence of two separate aggravating circumstances, the Court specifically places on the record that it has balanced each of these two aggravating circumstances collectively and individually and reaches the conclusion that either of the two found aggravating circumstances, by itself, when balanced against the offered mitigation, warrants the imposition of the death penalty.

The Court specifically finds that any mitigation offered by the defendant is offset by the rebuttal evidence introduced by the State that the defendant has been previously convicted of three separate felony offenses and the evidence that establishes beyond a reasonable doubt that the defendant, approximately two months before the murder of Glen Estes, committed an aggravated assault, using a knife, upon the person of Rick Ulibarri because of the defendant's belief that Mr. Ulibarri had stolen the manifold which caused the defendant to murder Glen Estes.