921 P.2d 1151

**STATE of Arizona, Appellee,**

v.

**Don Jay MILLER, Appellant.**

**No. CR–93–0557–AP.**

Supreme Court of Arizona,
En Banc.

July 11, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Dawn M. Northup, Assistant Attorney General, Phoenix, for State of Arizona.

Susan A. Kettlewell, Pima County Public Defender by Nancy Follin Jones and Brian X. Metcalf, Deputy Public Defenders, Tucson, for Don Jay Miller.

## OPINION

MARTONE, Justice.

A jury found Don Jay Miller guilty of premeditated first degree murder and kidnapping. The court sentenced him to death for the murder and prison for the kidnapping. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz.R.Crim.P., and direct under A.R.S. § 13–4031. We affirm his convictions and sentences.

## I. BACKGROUND

Jennifer Geuder, the 18–year–old victim, started pressing Anthony Luna, her boyfriend, for child support of $50 per month for their one-year-old son. Luna asked Miller to help kill her.

On Friday, June 12, 1992, the victim told her roommate that she was going to the movies with Luna and his friend "Mark." "Mark" is one of Miller's aliases. They kidnapped her after the movie. Luna drove the victim's car, while Miller followed in Luna's truck. On Mt. Lemmon, Luna shot her once in the head with Miller's .25 caliber handgun

and gave the gun back to Miller. Luna drove the victim down the mountain to the desert. Miller again followed in Luna's truck. When the vehicles came to a stop, she tried to escape by hiding under the car. Miller then shot her in the head five times. Miller either yanked or cut a large clump of her hair.[1] Miller and Luna then got rid of some physical evidence and washed Luna's truck.

A jogger discovered the victim the next morning. The police obtained an arrest warrant for Luna. They also obtained a search warrant for Miller's trailer and car. While serving the warrant, the police handcuffed and detained Miller, and then brought him to the police station. Miller admitted he shot the victim but claimed that she was already dead.

The trial court found that the murder was especially cruel, heinous and depraved, and that none of the mitigation was sufficiently substantial to call for leniency.

## II. ISSUES

### A. *Trial Issues*

1. Was the search warrant valid?

2. Should Miller's statement to the police have been suppressed?

3. Was the death qualification of the jury proper?

4. Should Miller have been permitted to make an opening statement to potential jurors before voir dire?

5. Did the trial court err in failing to redact statements attributed to Miller's roommate made during Miller's interrogation?

6. Did the trial court err in allowing a friend of Luna's to testify that before the murder Luna said "Mark" agreed to provide an alibi?

7. Should three expert opinions concerning soil disturbance have been excluded?

8. Was the jury properly instructed?

9. Were prejudicial photographs admitted?

10. Did the use of leg irons and shackles prejudice Miller?

11. Was there sufficient evidence for the murder and kidnapping convictions?

### B. *Sentencing Issues*

1. Did the trial court improperly rely on victim impact evidence?

2. Was the trial court biased?

3. Is the A.R.S. § 13–703(F)(6) finding proper?

4. Did the trial court improperly rely on the presentence report?

5. Did the trial court err in its consideration of Miller's mitigation?

6. Did the trial court err in its balancing of aggravation and mitigation?

7. Should this court reduce Miller's sentence as part of its independent review?

8. Is Miller entitled to a proportionality review?

9. Should the trial court have granted Miller's motion to strike the death notice?

10. Is the Arizona death penalty statute constitutional?

### C. *Issues Waived at Trial*

Miller raises the following issues for the first time on appeal. The issues therefore are waived. Furthermore, there was no fundamental error.

1. Did the trial court err in excusing four potential jurors for cause and in not excluding another juror for cause?

2. Did the State's use of a preemptory challenge against a potential juror require reversal?

3. Did prosecutorial misconduct require reversal?

4. Did the admission of "other act" evidence require reversal?

---

**1.** Miller's statements are inconsistent. First, he said the last thing he did was to grab and yank her hair from her head. State's Ex. 77, at 63. A short time later, he said that he pulled her hair out before he shot her. *Id.* at 66. After he was sentenced, Miller offered expert testimony that the hair had been cut and not pulled. *See infra,* at 324–325, 921 P.2d at 1161–62.

## III. ANALYSIS

### A. *Trial Issues*

#### 1. *The validity of the search warrant*

■ Miller argues that the search warrant was invalid and the fruits of the search, including the murder weapon, should have been excluded. Probable cause was based on information provided by two people. Regina Lamb, the victim's friend, told the police she was on the phone with the victim who told her that "Mark" and Luna had arrived to take her to a movie. David Arias, Luna's close friend, told the police that a week before the murder Luna had asked him to help kill the victim. Arias told the police that Luna said the murder was to occur the following Friday, the day it actually occurred. In addition, Luna told Arias that "Mark" would provide an alibi. Arias showed the police where "Mark" lived, Miller's residence, and told police that "Mark" owned a small handgun that he had last seen three to four weeks before the murder. The police obtained a telephonic search warrant for Miller's premises, and search and arrest warrants for Luna.

Miller argues that the information upon which the search warrant was based was unreliable, insufficient, and untruthfully presented to the issuing judge. We disagree. The search warrant clearly indicates the basis for the police officer's belief that incriminating evidence would be found at Miller's residence and in his car. The police officer adequately and truthfully informed the issuing judge about the material facts. There was no error.

#### 2. *Miller's confession*

Three days after the murder, a Special Weapons and Tactical (SWAT) team executed the search warrant on Miller's house and car. Nine Pima County Sheriff's deputies, dressed in jumpsuits, combat boots, and helmets, carrying .45 caliber pistols, shotguns, and assault rifles, entered Miller's trailer without notice and immediately detained everyone. They handcuffed Miller and placed him in a chair in the front yard. A detective asked if he would go to the police station to answer questions. Miller agreed. The police did not have an arrest warrant. The police took him to the station, gave him his warnings under *Miranda*, and told him they would take him home if he wanted. Miller agreed to answer questions.

Miller initially denied having any knowledge of the murder, but eventually confessed. He admitted going to the movies with Luna and the victim. He admitted giving Luna the gun before they took the victim to Mt. Lemmon. He admitted being present when Luna shot her on Mt. Lemmon. He said that Luna immediately returned his gun. He then told the police that he followed Luna down Mt. Lemmon at a high rate of speed until they reached the desert in northeast Tucson. Finally, and perhaps most importantly, he admitted he shot the victim.[2]

### A. Voluntariness

■ Miller argues that his statements were involuntary and should have been excluded. We disagree. Although Miller provided highly incriminating evidence, he thought he was helping himself. Throughout his interrogation, Miller first lied, and then offered an alternative explanation when confronted with contrary information. He initially denied ever having met the victim. He then denied that he went to the movies with Luna and the victim. But then he claimed that he was dropped off at his home after the movie. He admitted he was with Luna when he shot her on Mt. Lemmon. He claimed she was killed instantly. Finally, after having denied that he shot her, he admitted firing five shots into her. We agree with the trial court that Miller made these statements voluntarily.

### B. The Arrest

■ Miller argues that the police arrested him by handcuffing him and transporting him to police headquarters for questioning. The

---

**2.** He claimed that the victim was dead when he shot her. Evidence from the murder scene, *infra* at 322–323, 921 P.2d at 1159–60, disproved this contention. At another point, he acknowledged that the victim was not instantly killed by Luna on Mt. Lemmon, and told the police: "I know she was suffering. I wanted to take her to a hospital." Ex. 77, at 61.

State argues that Miller was not arrested because he went with the police voluntarily and, at headquarters, was told he was free to go home if he wanted. The trial court assumed, *arguendo*, that Miller was arrested without probable cause.

An arrest occurs when "the suspect's liberty of movement is interrupted and restricted by the police." *State v. Ault*, 150 Ariz. 459, 464, 724 P.2d 545, 550 (1986). A finding that an arrest occurred is determined by viewing the facts objectively, *id.*, and is a mixed question of law and fact. *State v. Winegar*, 147 Ariz. 440, 445, 711 P.2d 579, 584 (1985).

Nine heavily armed SWAT team officers arrived unannounced at his house. He was handcuffed and placed in a chair. They took him to the police station. Although the issuance of the search warrant authorized the police to detain him while the warrant was being executed, *Michigan v. Summers*, 452 U.S. 692, 704–05, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981), at some point this went beyond detention.[3] We agree with the trial court that Miller was arrested. And because the police lacked probable cause, the arrest was illegal.

#### C. Was the statement the fruit of an illegal arrest?

Although Miller made a statement after an illegal arrest, it does not automatically follow that the statement should have been excluded. A statement is inadmissible only if it is the fruit of an illegal arrest. *Brown v.*

3. Miller has never argued that the use of a SWAT team was improper. Nor has he argued that the police used excessive force or otherwise acted improperly while executing the warrant. Therefore, the reasonableness of the force used is not an issue.

4. The interrogation started with this exchange:

Q (Det. Nanos): Okay, okay. And, and understand you're not under arrest . . .
Q: I'm just trying to make sure that you understand that this is up to you to be here or not. And if you don't want to talk to me you don't have to talk to me[.] [D]o you know that?
A (Miller): Um, I, I didn't know that, but . . .
Q: Okay.
A: I'll, I'll talk to you.

*Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Reffitt*, 145 Ariz. 452, 702 P.2d 681 (1985). *Brown* and *Reffitt* set forth four factors to help determine whether the taint from an illegal arrest has been purged: 1) the voluntariness of the confession, as a threshold requirement; 2) the temporal proximity between the illegal arrest and the confession; 3) the presence of intervening circumstances; and, particularly, 4) the purpose and flagrancy of official misconduct. *Brown v. Illinois*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *State v. Reffitt*, 145 Ariz. at 458, 702 P.2d at 687.

First, Miller voluntarily made these statements. *See supra*, at 319, 921 P.2d at 1156. Second, Miller made his statements approximately one and one-half hours after he was initially detained. Although we found that the same period of time weighed in favor of exclusion in *State v. Reffitt*, we also said that "this factor is scarcely outcome determinative" and "is often the least helpful of the three criteria." 145 Ariz. at 459, 702 P.2d at 688. This is not a case like *State v. Monge*, 173 Ariz. 279, 842 P.2d 1292 (1992), where the consent to search was given immediately after an illegal arrest.

Third, we consider the presence of intervening circumstances. The police read Miller his *Miranda* rights. The police also told him that he was free to end the interview at any time, and that he could go home if he wanted. Miller clearly understood this, but decided to talk to the police anyway.[4]

Q: Well, okay, let me so we can make it official okay, so you understand. Um, you have the right to remain silent and anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford one, one will be appointed to you, uh, at no cost to you. You understand those rights?
A: Yes sir.
Q: Okay. Um, and at any time during the interview uh, right now, during it, after it, at any time if you want an attorney or you just don't want to talk to me just say so is that okay?
A: Yeah, what would happen?
Q: I'm not gonna talk to you.
A: I mean what would happen to me?
Q: You, I'll take you back home.
A: Oh.

Some of Miller's inculpatory admissions were made after he was confronted with his roommates' statements. The police had probable cause to search Miller's residence and automobile, and had obtained a valid search warrant to do so. *See supra*, at 318–319, 921 P.2d at 1155–56. Excluding confessions resulting from illegal arrests serves interests and policies of the Fourth Amendment, not the Fifth Amendment. *See e.g., Brown v. Illinois*, 422 U.S. at 601, 95 S.Ct. at 2260; *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). "The chief evil against which the Fourth Amendment is directed" is the "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980). Thus, to the extent the exclusionary rule of the Fourth Amendment is concerned with protecting the privacy of one's home, Miller's privacy interests had already been diminished by the issuance of the search warrant. *See Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340.

Fourth, we consider the purpose and flagrancy of the police misconduct. Because the police had obtained a valid search warrant for Miller's home, they were authorized to detain him while they conducted the search. *Michigan v. Summers*, 452 U.S. at 704–05, 101 S.Ct. at 2595. "If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified," the detention "is constitutionally reasonable." *Id.* However, while the detention was proper, at some point during execution of the warrant the police went beyond detention and an illegal arrest occurred.

In view of all of the circumstances, we conclude that Miller's statements were not the fruit of an illegal arrest. The confession was voluntary. The temporal proximity between the arrest and the statement was not immediate. The police made sure Miller understood he could end the interview and be returned home if he so desired. This case is unlike *State v. Winegar*, 147 Ariz. at 448, 711 P.2d at 587, in which the police failed to let the defendant know she was free to leave.

Q: Okay, you you're not under arrest.
A: Okay.

Miller decided to talk, not because the police illegally transported him to the police station, but because he thought he might be able to escape criminal liability. Finally, while there was no probable cause to arrest, in this case the police had the right to detain him pending execution of the search warrant.

### 3. *Death qualification of the jury*

During voir dire, the court asked whether there was "anyone on the panel who has such negative feelings about the death penalty that you could not sit fairly and impartially knowing that [it] might be a potential punishment in the event of a conviction." Tr. Jul. 6, 1993, at 59. Miller argues that it was error to death qualify the jury because the trial court imposes the sentence. We have rejected this argument. *E.g., State v. Scott*, 177 Ariz. 131, 137–38, 865 P.2d 792, 798–99 (1993).

Miller also argues that: the trial court's inquiry was improper because it suggested that jurors with death scruples should not be on the jury; it was error for the trial court not to ask whether anyone's feelings favoring the death penalty could affect his or her ability to sit fairly and impartially; and it was error not to use a questionnaire or individual voir dire. Because Miller did not object to the court's death qualification procedure, these arguments are waived. *State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). There was no fundamental error.

### 4. *Opening statement before voir dire*

The court denied Miller's motion to permit opening statements before voir dire. There was no error. Under Rule 18.5(c), Ariz.R.Crim.P., in effect at the time of Miller's trial, the court conducts voir dire, and in its discretion, may allow parties to question jurors. The rule did not permit such an opening statement. Even as amended, the rule conditions such an opening statement on the "court's consent." Rule 18.5(c), Ariz. R.Crim.P. (1995).

Ex. 77, at 2–3.

### 5. *Floyd Hamilton's statements*

■ Floyd Hamilton rented a room from Miller, and was home when the SWAT team executed the search warrant. The police took Hamilton to the station and questioned him and Miller at the same time. During Miller's interrogation, a detective told Miller that other people said he shot the victim. Miller first denied this. The detective told Miller he knew he shot her and that "the reason I know this is because ... you told one of your friends and I talked to him." Ex. 77 at 61. Miller then admitted that Luna fired the first shot and he fired the remaining shots. *Id.* at 62. Miller argues that the friend was Hamilton and the statement was hearsay.

The detective's statement, admitted over Miller's hearsay objection, was part of Miller's interrogation. The statement, admitted to show its effect on Miller during his interrogation, was not offered for its substantive content and therefore was not hearsay. *See State v. Ceja,* 113 Ariz. 39, 41–42, 546 P.2d 6, 8–9 (1976). Miller initially denied his participation. He confessed only after being told that others, including his roommates, had implicated him. There was no error.

### 6. *Admission of Luna's hearsay statement that Miller agreed to be an alibi*

■ David Arias, Luna's friend, testified that Luna asked him to help murder the victim a couple days before the murder, that the murder occurred on the night Luna had said it would, and that Luna said "he would have an alibi through Mark." Tr. Jul. 8, 1993, at 164. Miller objected to the alibi testimony. The court ruled that it was admissible as a statement against penal interest. Rule 804(b)(3), Ariz.R.Evid. Luna, the declarant, refused to testify and was thus unavailable.

A statement against interest is a statement which at "the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true." Rule 804(b)(3), Ariz.R.Evid. The statement need only have probative value and need not be a direct confession of guilt.

*State v. LaGrand,* 153 Ariz. 21, 27, 734 P.2d 563, 569 (1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987).

Luna's statement that Miller would provide him an alibi subjected Luna to liability for murder and conspiracy to commit murder. The evidence in turn was properly admitted against Miller because it proved that the murder was planned and that Luna anticipated that Miller would assist him in some way. There was no error.

### 7. *Soil disturbance evidence*

Miller argues that the court erred by admitting the opinions of three experts that the victim was alive when he shot her in the desert. The testimony to which Miller objects is that of a detective and a medical examiner, and the statement of another detective at Miller's interrogation. Miller argued that because he thought the victim was dead when he shot her, he could not be guilty of premeditated murder. The State introduced evidence showing that the victim was alive. Photographs of the murder scene show a struggle. Miller does not challenge the admission of these photographs.

■ Miller's argument is not clear. He appears to argue that expert testimony was not necessary and the witnesses were not properly qualified as experts. But the detective did not testify as an expert. She testified that the victim's shorts and belt buckle made grooves in the sand. She also testified that vegetation found in the victim's hand appeared to have come from a plant approximately 12 to 13 inches away. This is proper lay testimony. The detective's opinion was based on her perception of the murder scene and assisted the jury in understanding the photographs. Rule 701, Ariz.R.Evid. There was no error.

■ The medical examiner testified that rigor mortis hardened the victim's grasp of vegetation found in her hand, suggesting that she grabbed it while alive. In addition, he testified that the victim could have been able to move her legs after she was shot, and thus make the grooves in the sand.

 Miller did not object to the medical examiner's qualifications or testimony. His motion in limine addressed the police only. Thus, the argument over the medical examiner's testimony is waived. Even had there been no waiver, the admission of the medical examiner's testimony was not error. Rule 702, Ariz.R.Evid.

 Finally, Miller argues that a detective's statement about a struggle should have been redacted from the tape of his interrogation. He did not request exclusion, so his claim is waived. Nor is there fundamental error.

## 8. *Jury Instructions*

Miller argues that 12 jury instructions were erroneous. But he objected to only three of them. He has thus waived the nine other claims of error, none of which rise to the level of fundamental.

 Miller argues that the trial court erred by failing to give his "theory of defense" instruction.[5] The trial court ruled that Miller's proposed instruction impermissibly commented on the evidence. We agree. *See State v. Salazar,* 173 Ariz. 399, 409, 844 P.2d 566, 576 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993).

 Miller next argues that the trial court's accomplice instruction was erroneous because it did not define culpable mental state. This argument is in a footnote in the opening brief. It is waived because Rule 31.13(c), Ariz.R.Crim.P., requires that argument appear in the "body" of a brief. *See State v. Walden,* 183 Ariz. 595, 605, 905 P.2d 974, 984 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). In all events, this contention is without merit. The jury was adequately instructed on the requirements of "intentional," "knowing," and "reckless" conduct.

Finally, Miller argues that the trial court's instruction to disregard Luna's absence was erroneous. The instruction provided that:

[i]t is no defense to the crime charged … that another person or persons not now on trial might have participated or cooperated in the crime. You're not to guess the reason for the absence from the courtroom of such other person or persons, if any, as the only matter before you for your decision is the guilt[ ] or innocence of Don Miller.

Tr. Jul. 12, 1993, at 28. But this instruction is a correct statement of the law. *See State v. Salazar,* 173 Ariz. at 410, 844 P.2d at 577. There was no error.

## 9. *Photographs*

 Miller objected to the introduction of three autopsy photographs. Inflammatory photographs are admissible if they are relevant and not unfairly prejudicial. *State v. Walden,* 183 Ariz. at 610, 905 P.2d at 989. The trial court ruled that the photographs were not particularly inflammatory or prejudicial, and that they were important evidence on whether the victim was alive when Miller shot her. We agree. There was no error.

Miller also claims it was error to admit another autopsy photograph. He failed to object and thus waived this claim. There was no fundamental error.

## 10. *Use of Leg Irons and Shackles*

 Miller objected to the use of shackles during trial. The court denied his request. Miller does not claim that the jury ever saw him shackled, and thus he fails to show prejudice. *State v. McMurtrey,* 136 Ariz. 93, 98, 664 P.2d 637, 642 (1983), *cert. denied,* 464 U.S. 858, 104 S.Ct. 180, 78

---

5. Miller requested the following instruction:
 Mr. Miller's position is that his knowledge about and involvement in what happened to Jennifer Geuder prior to Anthony Luna shooting her on Mount Lemmon was limited to loaning a gun to scare Jennifer Geuder and accompanying both to Mt. Lemmon.
 Under this theory of defense, Mr. Miller can be held accountable, as an accomplice, only

for those acts of Anthony Luna that were a natural and probable consequence of the scheme that Mr. Miller aided, i.e., scaring Jennifer Geuder with a gun. It is the theory of Mr. Miller that Mr. Luna's premeditated murder of Ms. Geuder was not a natural and probable consequence of a scheme to frighten her.

L.Ed.2d 161 (1983). This claim is without merit.

11. *Sufficiency of the evidence for the premeditated murder and kidnapping charges*

 Miller argues that there is insufficient evidence to support his convictions for premeditated murder and kidnapping. Miller told police that Luna shot the victim on Mt. Lemmon and then gave him the gun. Luna drove the victim down to the desert in the victim's car. Miller followed in Luna's truck. This evidence supports the kidnapping conviction.

Once Luna stopped, Miller shot the victim five more times. Although Miller told the police the victim was dead, the evidence indicates otherwise. In addition, Miller gave Luna a loaded gun and followed him up Mt. Lemmon. His premeditated murder conviction is supported by the evidence.

## B. Sentencing Issues

### 1. Victim Impact Evidence

 Miller claims that the victim's parents should not have been permitted to address the court. The victim's parents testified that the murder had a terrible impact on their lives and that they did not believe Miller's new-found religion was genuine. Her father said that death was the appropriate punishment. The court allowed the parents to rebut Miller's videotaped statement, which he offered as mitigation. He said he was "sorry for what happened" and discussed his religious conversion. Ex. N (videotape).

But the trial court found that Miller's remorse and religious conversion were mitigating. The court thus found that the victim's parents' statements did not rebut Miller's offer of mitigation. *See infra*, at 327, 921 P.2d at 1164. Moreover, at sentencing the court indicated that it did not consider the parents' statements, Tr. Dec. 20, 1993, at 13, and therefore there was no error. *State v. Spears*, 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996).

### 2. Trial judge

 Miller argues that the trial judge was biased, and decided to sentence him to death at Luna's sentencing. The judge indicated that he considered rejecting Luna's plea because it excluded the death sentence. This does not show bias against Miller. Indeed, the judge spent a substantial amount of time deliberating on Miller's sentence. This claim is without merit.

### 3. Evidence of cruel, heinous, and depraved

Miller argues that the evidence is insufficient to prove the existence of the § 13–703(F)(6) aggravating factor. He argues that his statement is unreliable. We disagree. It is sufficiently corroborated by other evidence in the case. *State v. Gerlaugh*, 134 Ariz. 164, 170, 654 P.2d 800, 806 (1982).

#### a. Heinous and Depraved

 Miller challenges the court's finding of heinous and depraved. The court found that the murder was senseless because Miller did not know the victim and had "the most flimsy of reasons" to kill. Minute Entry, Dec. 1, 1993, at 4. Miller apparently does not challenge this finding.

Miller claims that the court's finding that the victim was helpless is inconsistent with its finding that the victim was attempting to escape. This contention is patently meritless. By Miller's admission, Luna had already shot the victim. When Miller approached her, gun in hand, she was helpless.

Miller challenges the finding that he inflicted gratuitous violence on two grounds. First, he claims that evidence discovered after sentencing—the fact that the victim's hair had been cut from her head rather than pulled—requires a new sentencing hearing. Second, he contends that removing hair from the victim is not gratuitous violence.

Large clumps of the victim's hair had been removed. Miller told police he pulled her hair after he shot her to make it look like a madman committed the murder. After sentencing, Miller filed a motion under Rule 24.3, Ariz.R.Crim.P., claiming that the court relied upon erroneous information. Miller offered evidence that the victim's hair had been cut. The State stipulated that the hair had been cut, but argued it made no difference. The trial court assumed at sentencing

that Miller pulled out her hair. The trial court relied upon this act to find heinous and depraved, and also to rebut intoxication as a mitigating factor. The court gave it special significance, telling Miller that "this is what's going to put you in the gas chamber one day." Tr. Dec. 20, 1993, at 23. Miller interrupted the court during sentencing to assert that the hair had been cut, not pulled. The court responded that "whether it was cut or yanked it demonstrates a lack of humanity about somebody." *Id.* at 22.

The Rule 24.3 motion was properly denied. The court had already indicated that it made no difference whether Miller cut or pulled the victim's hair from her head. Miller also challenges the finding that cutting her hair constituted gratuitous violence. We disagree. Whether he cut her hair or pulled it out, he inflicted injury beyond that necessary to kill. *State v. Brewer,* 170 Ariz. 486, 502, 826 P.2d 783, 799 (1992), *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). The heinous and depraved finding, based on senselessness, helplessness, and gratuitous violence, is proper.

### b. Cruelty

Miller also challenges the cruelty finding. The evidence at the murder scene demonstrated that the victim must have experienced great mental and physical suffering. The court found that Miller's criminal liability attached from the moment he provided Luna the gun. Thus, Miller is responsible for the suffering the victim experienced after being shot on Mt. Lemmon and driven down to the desert, a period of time in which Miller had the gun. The victim clearly experienced even more mental and physical anguish at the desert. She struggled to escape. By Miller's admission, he shot the victim repeatedly once they stopped. The cruelty finding is proper.

### 4. *Use of the presentence report*

■ On Miller's motion, the court agreed not to look at the presentence report until after it sentenced Miller on the murder count. Miller later offered his lack of a felony record as a mitigating circumstance. The State asked the court to take judicial notice of Miller's history in the presentence report. Miller did not object. Once Miller offered his lack of felony record in mitigation, the rest of his record was proper rebuttal. *State v. Rossi,* 171 Ariz. 276, 278–79, 830 P.2d 797, 799–800 (1992), *cert. denied,* 506 U.S. 1003, 113 S.Ct. 610, 121 L.Ed.2d 544 (1992). *See State v. Kemp,* 185 Ariz. 52, 59–61, 912 P.2d 1281, 1288–90 (1996).

### 5. *Mitigating circumstances*

Miller sought to prove intoxication in mitigation under A.R.S. § 13–703(G)(1). He also sought to prove the following non-statutory mitigating factors: the more culpable party did not receive a death sentence; Miller has no prior felony record; Miller admitted his guilt; Miller cooperated with the police; Miller had become religious; Miller lacked the intent to kill; Miller was sexually and emotionally abused as a child.

### a. Intoxication

■ Under A.R.S. § 13–703(G)(1), intoxication is mitigating when it impairs "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." Miller argues the court erred in failing to find his intoxication mitigating. He claims that he had consumed a large amount of alcohol and had taken a number of Percocets, a narcotic painkiller, before the murder. His roommates told the police that he had consumed a large quantity of alcohol.

In rejecting intoxication as mitigating, the court relied on Miller's criminal history, the removal of the victim's hair, and his ability to drive down Mt. Lemmon at night at a high rate of speed.

The presentence report indicated that Miller once assaulted a group of students with a .22 caliber handgun. Because Miller claimed that his lack of felony record was mitigating, his criminal history was proper rebuttal to this and other mitigating circumstances. A.R.S. §§ 13–703(C) & (G). Miller claimed that he was not violent toward people and the murder would not have happened had he not been intoxicated. This prior act tended to refute Miller's claim.

The court also reasoned that Miller's act of removing hair from the victim showed his intoxication was not mitigating. Miller argues that the trial court's findings on when the victim's hair was pulled out are inconsistent. The court, in its finding of heinous and depraved, described the victim as "either dead or past the point of realistically surviving." Minute Entry, Dec. 1, 1993, at 3. Nineteen days later, in rejecting intoxication as mitigating (and in its weighing of aggravation and mitigation), the court indicated that the victim was alive and suffered additional pain from having her hair pulled. Minute Entry, Dec. 20, 1993, at 4. But this discrepancy is irrelevant to the issue of intoxication.

In rejecting intoxication as mitigating, the court gave the most weight to Miller's ability to drive down Mt. Lemmon, at night, at a high rate of speed. He had the only gun at that point. He pulled the living victim from the vehicle, pulled or cut her hair, and shot her 5 times. *Id.* at 3–4.

We agree with the trial court that Miller's intoxication did not impair either his ability to conform his conduct to the law or his appreciation of the wrongfulness of his conduct. As we said in *State v. Kiles*, "[w]e refuse to equate defendant's *unwillingness* to control his actions with his *inability* to do so." 175 Ariz. 358, 374, 857 P.2d 1212, 1228 (1993), *cert. denied*, 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). We thus affirm the trial court's finding that intoxication was not a statutory mitigating circumstance.

#### b. Luna's sentence

■ Luna pleaded guilty to first degree murder and was sentenced to life imprisonment. The court found this mitigating, but not sufficiently substantial to warrant leniency. Miller argues that Luna's life sentence renders his death sentence fundamentally unfair. We disagree. A difference in sentences between co-defendants through appropriate plea bargaining is not mitigating. *State v. Stokley*, 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). Moreover, Miller committed the murder in a cruel, heinous, and depraved manner, making his sentence appropriate notwithstanding Luna's less severe sentence. *See State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993), *cert. denied*, 510 U.S. 1026, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993) (noting that "where the murder is especially cruel, heinous or depraved, unexplained disparity has little significance.").

#### c. Miller's lack of a felony record

■ Although Miller had not been convicted of a felony, he did have a substantial criminal history. The court found that his lack of a felony record was not mitigating. We agree. *State v. Rossi*, 171 Ariz. at 278–79, 830 P.2d at 799–800.

#### d. Admission of guilt and cooperation with the police

■ Although admission of guilt and cooperation with the police can be mitigating, there was no evidence of that here. The court found that these mitigating factors did not exist, and we agree. Miller repeatedly lied, and only inculpated himself when confronted with evidence of his lies. He denied shooting the victim while she was alive despite overwhelming evidence to the contrary.

#### e. Miller's religious conversion

Miller became religious after his arrest. The court found that this was mitigating. The court also found, *sua sponte*, that Miller's remorse was mitigating.

#### f. Miller's intent to kill

Miller claimed that the evidence showed he lacked the intent to kill. The court found that this mitigating factor did not exist, and we agree. The jury verdict and the evidence indicate Miller intended to kill.

#### g. Miller's early abuse

Miller claimed he suffered abuse as a child. The court agreed and found this to be mitigating. The court noted that his brother and sister were the most severely abused. The court also found that Miller's abuse was much less severe than that experienced by other defendants. It concluded that Miller was not influenced by his childhood abuse at the time of the murder, and we agree.

h. Mitigating factors argued for the first time on appeal

Miller argues that the trial court failed to consider specific instances of non-statutory mitigation, which he now raises for the first time on appeal. Specifically, he claims the following are mitigating: intoxication as non-statutory; duress; impulsivity; low intellectual functioning and learning disability; the personality of a follower; and, supportive family. But the trial court said that it considered all statutory and non-statutory mitigation, including mitigation Miller did not offer. Minute Entry, Dec. 20, 1993, at 1. Moreover, these alleged mitigating factors are not supported by the record.

Finally, Miller argues that the trial court did not give some mitigating factors the weight they deserve and failed to weigh the mitigation cumulatively. Both contentions are without merit. The court gave weight to Luna's sentence, which is not mitigating. In addition, the court gave the right weight to the other mitigating circumstances. It even found a mitigating factor, remorse, that had not been argued. While the court did weigh each mitigating factor against the aggravating factor, it also indicated it weighed all the mitigation cumulatively.

6. *Weighing of aggravating and mitigating factors*

The court found one aggravating factor and four mitigating factors (Luna's sentence, remorse, religious conversion, and abuse as a child). Miller argues that the court double-weighed the (F)(6) factor by finding that the murder was especially cruel, and also heinous and depraved. But weighing aggravation is not simply the counting of factors. Although (F)(6) could only be counted once, a finding that an offense is both cruel and depraved does not mean that it has been counted twice. *State v. Gulbrandson*, 184 Ariz. 46, 71, 906 P.2d 579, 604 (1995) ("In weighing, we do not simply count the number of aggravating or mitigating factors. The quality and strength of each must also be considered."). Weighing is both quantitative and qualitative analysis.

Miller argues that the court's findings on whether the victim was alive when her hair was yanked or cut are inconsistent. As we have already noted, the court found that removing the victim's hair, "was an act of needless violence to a woman who was either already dead or past the point of realistically surviving." Minute Entry, Dec. 1, 1993, at 3. At the sentencing hearing held nineteen days later, the court, in rejecting intoxication as a statutory mitigating circumstance, indicated that the victim was alive when her hair was removed. *See supra*, at 325–326, 921 P.2d at 1162–63. In the court's balancing of aggravation and mitigation, it found that Miller had "dragged the wounded victim from the car, pulled a hank of hair from her head, an act requiring great force and determination, and then pumped five bullets into her body." Minute Entry, Dec. 20, 1993, at 6.

The court's aggravation finding clearly indicates that it relied on the removal of the victim's hair only to prove heinous and depraved, and not cruelty. Whether she was alive is thus not relevant to the heinous and depraved finding. Although the special verdict appears inconsistent, the findings were made nineteen days later and did not modify the court's cruelty finding which did not rely on the hair incident. The court rejected intoxication as a mitigating circumstance, primarily because Miller was able to drive down a difficult mountain road at night at a high rate of speed. The court referred to the hair incident as an act of "great force and determination" to rebut Miller's claim of intoxication. Minute Entry, Dec. 20, 1993, at 6.

We do not believe the trial court's findings indicate that Miller's sentencing was defective. The special verdict indicates that the trial court spent a considerable amount of time deliberating and thoughtfully considered all of the aggravation and mitigation. The court's sentence was unaffected by the timing of the hair incident. In order to resolve any ambiguity, on independent review we find and rule that the removal of the hair is relevant to the heinous and depraved prong of the (F)(6) factor, and the consideration of mitigating evidence. We do not use it for the cruelty finding.

### 7. *Independent review*

We have independently reviewed the facts that establish the presence or absence of aggravating and mitigating circumstances and agree with the trial court that the mitigation here is insufficiently substantial to call for leniency. A.R.S. § 13–703.01(A).

### 8. *Proportionality review*

Miller argues he is entitled to a proportionality review of his sentence. This court no longer conducts proportionality reviews of death sentences. *State v. Salazar,* 173 Ariz. 399, 844 P.2d 566.

### 9. *Denial of motion to strike death notice*

■ As required by Rule 15.1(g)(1), Ariz. R.Crim.P., the State timely filed a notice of its intent to seek the death penalty. Miller filed a motion to strike the death notice because Luna's plea agreement included a stipulated life sentence. Miller argues that the denial of the motion was error. We disagree. Rule 15.1(g)(1) is procedural. *See State v. Jackson,* 186 Ariz. 20, 24, 918 P.2d 1038, 1042 (1996); *State v. Lee,* 185 Ariz. 549, 555, 917 P.2d 692, 698 (1996). We see no relationship between the death notice and Luna's plea. We also reject Miller's argument that the State's offer of a plea with life imprisonment for Luna—which was also offered to and refused by Miller—was an unconstitutional exercise of prosecutorial discretion. *See State v. Salazar,* 173 Ariz. at 411, 844 P.2d at 578.

### 10. *Other arguments*

Miller raises ten other sentencing claims that have been previously rejected by this court: judge sentencing violates equal protection; failure to channel the sentencer's discretion; unguided prosecutorial discretion; cruel and unusual punishment; discriminatory application of the death sentence; failure to prove that death is appropriate; preclusion from weighing evidence of mitigation; placement of burden of proof upon capital defendant; right to jury determination of sentencing factors; and vagueness of cruel, heinous, or depraved aggravator. We summarily reject them.

## IV. DISPOSITION

For the foregoing reasons, we affirm Miller's convictions and sentences.

FELDMAN, C.J., ZLAKET, V.C.J., MOELLER, J., and EHRLICH, Judge, concur.

Because of the retirement of Justice ROBERT J. CORCORAN, Judge EHRLICH of the Court of Appeals, Division One, was designated to sit and participate in the determination of this case, pursuant to Ariz. Const. art. VI, § 3.