NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

JORDAN KAY PETERMAN, *Appellant*.

No. 1 CA-CR 15-0710
FILED 12-20-2016

---

Appeal from the Superior Court in Mohave County
No. S8015CR201301480
The Honorable Lee Frank Jantzen, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By David Simpson
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Jill L. Evans
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Patricia A. Orozco delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge Peter B. Swann joined.

**O R O Z C O**, Judge:

**¶1** Jordan Kay Peterman appeals her convictions and sentences for conspiracy to possess, sell, transport and transfer marijuana and possession of marijuana for sale. For the reasons that follow, we affirm.

## BACKGROUND[1]

**¶2** On August 15, 2013, several local, state, and federal agencies participated in a "roundup" of subjects who had been indicted as part of an investigation by the Bureau of Alcohol, Tobacco and Firearms (A.T.F.). Led by A.T.F. Special Agent T. M., a team of eight to ten officers was tasked with locating and arresting Joshua Gunter, who was charged with buying and selling stolen firearms. Detective S. conducted a database search through the Mohave County Sheriff's Office and learned Gunter's last known address, an address Gunter had provided to a police officer during a March 2013 field interview. The team then drove to that address (the residence) and the officers spread out to "set up a perimeter."

**¶3** From his vantage point in the unfenced yard of a neighboring house that was situated "a little higher" than the residence, Detective B. could see over the wall enclosing the residence's backyard. While scanning the yard, Detective B. saw a large marijuana plant, and relayed that information to the officers positioned at the front door of the residence.

**¶4** With the officers all in place, Detective S. then knocked at the front door. After waiting for a brief period with no response at the door, Detective S. knocked "loudly" and shouted "police." Again, no one answered the door. Detective S. then began looking through windows and spotted a "bong," commonly used for smoking marijuana, on the coffee table in the living room. Another officer noticed an "empty holster" in the

---

[1] We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

back of a vehicle located in front of the residence. That officer also observed that the car's keys were in the ignition and the windows were rolled down.

¶5          After several minutes of knocking and shouting, Detective S. concluded that there were occupants in the home who were attempting to avoid the police. Although Detective S. did not believe the bong and plant were in danger of immediate destruction, he became "concern[ed]" that the occupants may be attempting to destroy other evidence. At that point, Detective S. "check[ed] the door," found it unlocked, and the officers, with guns drawn, went inside.

¶6          Upon entry, the officers conducted a protective sweep of the residence and located and handcuffed two men (John Monteiro and Joshua Lee) and two women (Candice Wirth and Peterman). The officers also collected two firearms, a bag containing marijuana, other drug paraphernalia, and what appeared to be grenades located in an open purse.

¶7          Within "the first five or ten minutes" of entry, the officers learned that Joshua Gunter did not live at the residence and none of the occupants knew him. The occupants also informed the officers that their marijuana was legal under the Arizona Medical Marijuana Act (AMMA). Arizona Revised Statutes (A.R.S.) sections 36-2801 to -2819 (2010). Indeed, Lee and Peterman produced patient AMMA cards and Monteiro provided the officers with both patient and caregiver AMMA cards. Agent M. then asked for consent to search the house and Monteiro refused, so Detective S. left to obtain a search warrant.

¶8          Meanwhile, other officers removed Peterman's handcuffs and told her she was free to leave but could not return to the residence until a search was conducted. Peterman did not leave, however, and was then instructed not to move about without permission. Although no officer informed Peterman of her *Miranda*[2] rights, Agent M. inquired about her drug use. In response to Agent M.'s questions, Peterman admitted that she obtained marijuana from Monteiro, but claimed her use was legal under the AMMA. Indeed, she told Agent M. that she had previously been subjected to a vehicle stop and was released, notwithstanding her possession of marijuana, because the amount was in compliance with the AMMA and she held a valid AMMA card. Peterman also admitted distributing marijuana to other cardholders for Monteiro, but likewise claimed her conduct was legal under the AMMA.

---

2          *See Miranda v. Arizona*, 384 U.S. 436 (1966).

¶9          When Detective S. returned with the search warrant, officers seized six marijuana plants, bagged marijuana, business cards that read "Medical Marijuana Serving Mohave County," pipes, bongs, scales and unused baggies.  The officers also seized cellular phones containing text messages, in which Monteiro and Peterman arranged transfers of marijuana to other AMMA card holders.  Two of Peterman's text messages specifically stated that such transfers would be for profit.

¶10          The State charged Peterman and Monteiro with one count of conspiracy to possess, sell, transport and transfer marijuana (Count 1), one count of possession of marijuana for sale (Count 2), one count of production of marijuana (Count 3), one count of possession of drug paraphernalia (Count 4), and one count of misconduct involving weapons (Count 5).  At trial, Monteiro and Peterman asserted an affirmative defense of immunity from prosecution under the AMMA.  Peterman did not take the stand, but Monteiro testified that he never distributed marijuana for profit.  The jury found Peterman guilty of Counts 1 and 2, not guilty of the remaining counts, and Monteiro not guilty of all charges.  The trial court sentenced Peterman to an eighteen-month term of probation.  Peterman timely appealed.  We have jurisdiction pursuant to A.R.S §§ 12-120.21(A)(1) (2003), 13-4031, and -4033(A)(1) (2010).

## DISCUSSION

¶11          Before trial, Peterman filed a motion to suppress both the physical evidence seized from her home and her statements to police officers.  Peterman argued the officers' warrantless entry into her home was illegal because: (1) the officers did not have probable cause to believe that the subject of the federal arrest warrant, Joshua Gunter, resided at her home or was presently at that address, and (2) no exigent circumstances otherwise justified a warrantless entry.  She also argued that she was subjected to custodial interrogation without being advised of her *Miranda* rights.

¶12          After holding a two-day evidentiary hearing and taking the matter under advisement, the trial court issued a detailed ruling on the motion.  The court found that Peterman's residence was one of four possible addresses known to law enforcement for Joshua Gunter and the officers failed to verify the validity of that address through reasonably available measures, such as surveillance, consulting with local utility companies, or cross-checking other government databases.  Because there was no reason to believe an attempt to substantiate the address would have been unduly burdensome, the court found that law enforcement officers "demonstrated a reckless disregard for the accuracy of the information underlying the

arrest warrant" and "did not reasonably believe the subject of the arrest warrant was in [Peterman's] home." The trial court also found there was no evidence of hot pursuit or any other exigent circumstance to justify a warrantless entry, noting the marijuana plant and bong were not vulnerable to immediate destruction and there was "no indication of any activity by the occupants inside or outside of the home." Accordingly, the trial court found that law enforcement officials' entry into Peterman's home "was unlawful."

¶13        Nonetheless, the trial court denied the motion to suppress, concluding the search warrant was supported by probable cause and the subsequent search was therefore lawful. In making this finding, the court excised the factors supporting probable cause for the search warrant that were based on the officers' observations after they illegally entered Peterman's home, and determined sufficient probable cause remained to support the search warrant, namely, the marijuana plant and bong that were observed before entry.[3] The court further found that law enforcement acted in good faith and without delay in obtaining and executing the search warrant. Finally, the court found that Peterman, who had been told she could leave the premises, was not in custody when questioned and therefore her statements were voluntary and "*Miranda* warnings were not required."

¶14        "We review the denial of a motion to suppress for an abuse of discretion, considering only the evidence presented at the suppression hearing and viewing the facts in the light most favorable to sustaining the ruling." *State v. Manuel*, 229 Ariz. 1, 4, ¶ 11 (2011) (internal citations omitted). We review de novo, however, mixed questions of law and fact that implicate constitutional rights. *State v. Soto*, 195 Ariz. 429, 430, ¶ 7 (App. 1999).

¶15        Both the Fourth Amendment to the United States Constitution and Article 2, Section 8, of the Arizona Constitution "proscribe unreasonable search and seizure by the state." *State v. Ault*, 150 Ariz. 459, 463 (1986); U.S. Const. amend. IV; Ariz. Const. art. 2, § 8. The unlawful entry of homes was the "chief evil" these constitutional provisions were "designed to prevent." *Ault*, 150 Ariz. at 463. The Arizona Constitution provides even greater protections for the sanctity of the home "than its

---

[3]        Although the trial court's ruling references six marijuana plants that "were readily observed by officers," Detective B. testified to seeing a single marijuana plant before the officers entered the residence.

federal counterpart," and, "[a]s a matter of Arizona law, officers may not make a warrantless entry into a home in the absence of exigent circumstances or other necessity." *Id*. at 463, 466.

¶16        The trial court held, and the parties agree, that the initial warrantless entry into Peterman's home was unlawful. Contrary to the court's further finding, however, Peterman contends that the subsequent search pursuant to a warrant violated her rights against unreasonable search and seizure.

¶17        "The exclusionary rule suppresses or excludes the introduction at trial of illegally obtained evidence[.]" *Ault*, 150 Ariz. at 465. That is, evidence "seized during, or obtained as a result of, a warrantless entry [into a] defendant's home without the excuse of exigent circumstances" must be "suppressed as the fruit of the illegal entry." *State v. Bolt*, 142 Ariz. 260, 263 (1984).

¶18        An exception to this rule is the independent source doctrine, which permits the admission of evidence "seized as a result of knowledge attributed to an independent source[.]" *Id*. Stated differently, evidence seized during the execution of a search warrant is not tainted by an initial warrantless entry if "the warrant was based on information legally obtained." *State v. Martin*, 139 Ariz. 466, 477 (1984). "The basic premise of the independent source doctrine is that the police should not be placed in a worse position than they would have been in, absent the illegal conduct." *State v. Gulbrandson*, 184 Ariz. 46, 58 (1995). When "a later, lawful seizure is genuinely independent of an earlier, tainted one," there is "no reason why the independent source doctrine should not apply." *Murray v. United States*, 487 U.S. 533, 542-43 (1988).

¶19        Moreover, when the probable cause supporting a search warrant included information "learned during an initial unlawful entry," as well as other information from independent sources, exclusion of the seized evidence is not necessarily required. *Gulbrandson*, 184 Ariz. at 58. Instead, the "proper method for determining the validity of the search . . . is to excise the illegally obtained information from the affidavit and then determine whether the remaining information is sufficient to establish probable cause." *Id*. "In addition, the state must show that information gained from the illegal entry did not affect the officer's decision to seek the warrant or the magistrate's decision to grant it." *Id*.

¶20        Here, the trial court properly excluded the information supporting the search warrant that was learned during the initial unlawful

entry, and found the remaining portions of the affidavit provided sufficient information to support a determination of probable cause. "Probable cause exists when the facts known to a police officer would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *State v. Sisco*, 239 Ariz. 532, 535, ¶ 8 (2016) (internal quotation omitted). Although the AMMA has legalized the use of marijuana "for medicinal purposes under the terms and conditions set forth in that Act," and marijuana possession "no longer necessarily reflects criminal activity under Arizona law," the presence of marijuana, nonetheless, warrants the reasonable belief that "there is a fair probability that contraband or evidence of a crime is present." *Id*. at 536, ¶¶ 14-16. Accordingly, because knowingly possessing, using, or producing marijuana is contrary to Arizona law absent authorization under the AMMA, *see* A.R.S. § 13-3405(A) (2010), the marijuana plant and bong observed in plain view before the officers' initial entry provided a reasonable basis to believe a crime was occurring.

**¶21** This is not the end of the inquiry, however. The State must also demonstrate that the officers' intent to seek a search warrant was independent of their illegal entry into Peterman's home. *Gulbrandson*, 184 Ariz. at 59. The trial court did not make an express finding on this issue. As the State notes, however, Detective S. testified that, in a typical situation, he would have followed up on an observation of a marijuana plant with a search warrant. This testimony was uncontroverted. Therefore, because the record supports a finding that the officers would have sought a search warrant independent of the information they learned after their unlawful entry, we cannot say the trial court erred by finding the search warrant was supported by probable cause.

**¶22** In the alternative, Peterman also contends that the seized evidence should have been suppressed because the officers were dilatory in obtaining the search warrant. Specifically, Peterman argues the passage of four and one-half hours between the officers' illegal entry into her home (8:35 a.m.) and Detective S.'s subsequent return with a signed search warrant (12:56 p.m.) was unreasonable.

**¶23** Police may lawfully secure premises without violating a property owner's constitutional rights "[s]o long as there is no unreasonable delay in seeking and procuring a search warrant[.]" *State v. Broadfoot*, 115 Ariz. 537, 539 (1977). In this case, there is no evidence of unreasonable delay. After the officers entered the residence, conducted a protective sweep, spoke with the occupants regarding Gunter, and requested consent for a search, Detective S. left the residence and drove

7

directly to the Mohave County Sheriff's Office to draft a search warrant and affidavit. Detective S. testified that he worked as quickly and diligently as possible to secure the warrant, even foregoing his lunch. Because the investigation was the result of a "federal, multi-agency team effort," Detective S. consulted the county attorney as well as various law enforcement officers from numerous agencies while drafting the search warrant. Consistent with the trial court's finding, nothing in the record suggests that the officers engaged in any dilatory tactics. To the contrary, the uncontroverted evidence reflects that Detective S. diligently worked on preparing and securing the search warrant without delay. Therefore, the trial court did not abuse its discretion by denying the motion to suppress on this basis.

¶24        Peterman also argues that her statements to officers following their illegal entry were inadmissible, because they were "tainted" by the officers' unlawful conduct.

¶25        Statements "obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (internal quotations omitted). "[T]o determine whether the taint of [] illegal conduct is sufficiently attenuated from evidence subsequently obtained by voluntary consent," we consider: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) 'particularly, the purpose and flagrancy of the official misconduct.'" *State v. Guillien*, 223 Ariz. 314, 317, ¶ 14 (2010) (*quoting Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

¶26        In this case, Peterman was awakened, in a state of partial undress, by eight to ten armed officers entering her home. She was then forced to the ground and handcuffed. After the officers' initial questioning regarding Gunter, the handcuffs were removed and Peterman was permitted to dress. Thirty to forty minutes after their entry, officers informed Peterman that she was free to leave but could not return to the residence until after their search was completed.[4] Agent M. testified that

---

[4]        At the suppression hearing, Peterman testified that she was never told she could leave, in contravention of Agent M.'s direct testimony. The trial court resolved this conflict in the evidence in favor of the State, expressly finding that Peterman "was advised that she was free to go[.]" We

he only questioned Peterman about her use of medical marijuana and marijuana transfers during the last two hours of the search, necessarily after Detective S. returned with the search warrant, but he acknowledged that he engaged Peterman "in ongoing discussions" throughout the day. Peterman also recalled that officers asked her questions throughout the day, and specifically testified that she was questioned about her use of marijuana before Monteiro left the residence, which was at 11:30 a.m., more than an hour before Detective S. returned with a search warrant. Because the trial court did not make a specific finding regarding this conflict in the evidence, on this record, it is not clear whether the officers obtained Peterman's potentially incriminating statements before or after they secured a search warrant.

¶27            Nonetheless, applying the relevant factors, "the totality of the circumstances militate against suppressing the evidence." *State v. Hummons*, 227 Ariz. 78, 82, ¶ 15 (2011). First, although it is unclear how much time elapsed between the officers' illegal entry and Peterman's admissions, the temporal proximity was not immediate and may have been hours. Second, the police removed Peterman's handcuffs and informed her that she was free to leave. *See State v. Miller*, 186 Ariz. 314, 320-21 (1996) (identifying an officer's statement that the defendant was free to leave as an intervening event). Third, there is no evidence in the record to suggest the officers engaged in flagrant misconduct. As found by the trial court, the officers unlawfully entered the residence, but the record does not reflect that the officers intentionally entered the home without a search warrant for the purpose of discovering evidence of wrongdoing. *See Hummons*, 227 Ariz. at 82, ¶ 14 (explaining an officer's "regular practices and routines" and reason for initiating the encounter are important considerations for evaluating the flagrancy of misconduct). Instead, the record reflects that the officers were attempting to effectuate an arrest pursuant to a valid warrant and, acting on unverified, dated information, unlawfully entered Peterman's home. Considering these factors, the trial court did not abuse its discretion by finding Peterman's statements to officers were untainted.

¶28            Finally, Peterman alternatively contends that she was subjected to custodial interrogation without being advised of her *Miranda* rights, and her statements were therefore inadmissible.

---

defer to the trial court's determination of witness credibility and resolution of conflicts in the evidence. *State v. Thomas*, 196 Ariz. 312, 313, ¶ 3 (App. 1999).

¶29      Although police officers are free to ask questions of a person who is not in custody without providing *Miranda* warnings, when a person is in custody, the police must advise the individual of certain constitutional rights; otherwise, statements made in response to questioning will be inadmissible at trial.  *See Miranda*, 384 U.S. at 444; *State v. Zamora*, 220 Ariz. 63, 67, ¶ 9 (App. 2009).  "[W]hether a person is in custody for *Miranda* purposes ultimately depends on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *State v. Maciel*, 240 Ariz. 46, 49, ¶ 11 (2016) (internal quotation omitted).  "A person's freedom of movement has been significantly curtailed if a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *Id*. at 50, ¶ 14.

¶30      As applied to these facts, Peterman was not in custody when questioned.  After the officers determined the subject of the arrest warrant was not present and removed Peterman's handcuffs, Agent M. explicitly told Peterman that she was free to leave.  Thus, Peterman's freedom of movement was not significantly curtailed and she could have ended her subsequent conversations with Agent M. at any time and simply walked away.  Therefore, the trial court did not abuse its discretion by finding that Peterman was not in custody when questioned and denying her motion to suppress.

## CONCLUSION

¶31      Peterman's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA