967 P.2d 106

**STATE of Arizona, Appellee.**

v.

**Beau John GREENE, Appellant.**

No. CR–96–0502–AP.

Supreme Court of Arizona,
En Banc.

Oct. 20, 1998.

432

Grant Woods, Attorney General, by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Dawn Northup, Assistant Attorney General, Phoenix, for the State of Arizona.

Harriette P. Levitt, Tucson, for Beau John Greene.

## OPINION

MARTONE, Justice.

¶ 1   A jury convicted Beau John Greene of first degree murder (both premeditated and felony murder), robbery, kidnapping, theft,

and six counts of forgery. The trial court sentenced him to death for the murder conviction, and to terms of imprisonment for the noncapital crimes. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz. R.Crim. P., and direct under A.R.S. § 13–4031. We affirm except as to the kidnapping conviction.

## I. BACKGROUND

¶2 Roy Johnson, a music professor at the University of Arizona, was last seen around 9:30 p.m. on February 28, 1995. He was leaving the Green Valley Presbyterian Church where he had just given an organ recital. Although his wife expected him home before 10:00 p.m., the ordinarily punctual Johnson did not make it back that night. Four days later, authorities found his body lying face down in a wash. Greene admitted at trial that he killed Johnson.

¶3 Greene testified that he had been using methamphetamine continuously for several days preceding the murder and that he had neither slept nor eaten much during that time. He said that he was suffering from withdrawal from drugs when he killed Johnson.

¶4 The day of the murder, Greene's friends, Tom Bevan and Loriann Verner, told Greene he could no longer stay in their trailer located west of the Tucson Mountains. A drug dealer had threatened to shoot Greene over an outstanding debt and Bevan and Verner feared Greene's presence in their trailer would ruin their relationship with the drug dealer. Greene stole a truck and drove to Tucson where the truck broke down. Sometime that night, during Johnson's drive home from the concert, Greene and Johnson crossed paths, but the record does not tell us how.

¶5 Greene's story, disbelieved by judge and jury, is as follows. Johnson approached Greene in a park. Greene claims that Johnson wanted to perform oral sex on him, and offered to pay him for it. Greene accepted, and the two drove to a secluded parking lot in Johnson's car. Greene says he then changed his mind and told Johnson that he would not follow through. In response, Johnson purportedly smiled and touched Greene's leg. Greene claims he "freaked out" at Johnson's touch, and struck him several times in the head with his fist. He moved Johnson's motionless body to the back of the car, drove to a wash, and dumped the body. Next, Greene says, he walked back to the car and drove away. He claims he then realized that he needed money so he returned to the wash, walked down to the body, and stole Johnson's wallet.

¶6 Several pieces of evidence undermine Greene's version of the killing. First, medical testimony indicates that a heavy flat object—not a human fist—damaged Johnson's skull. Fist bones striking a person's head will ordinarily shatter long before the thick bones of the skull, yet neither of Greene's hands were injured. Second, only one set of tire tracks and footprints entered and left the wash, suggesting that Greene did not return for the wallet, but had it with him when he left immediately after the murder. Third, Greene told Bevan he beat someone to death with a club and dumped the body near Gates pass.

¶7 After dumping Johnson's body in the wash, Greene drove Johnson's car directly to the Bevan/Verner trailer. He told Bevan about the killing. Greene asked Bevan for some clean shoes. He also took a small rug to cover the bloody car seats.

¶8 Greene left the trailer and headed for K-mart, the first of several stops he made on a spending spree using Johnson's cash and credit cards. To explain any discrepancies between his signature and those on the credit cards, Greene wrapped his hand with K–Y jelly and gauze and feigned injury. Among other things, he bought clothes, food, camping gear, a scope and air rifle, and a VCR (which he later traded for methamphetamine). He eventually abandoned Johnson's car in the desert. On March 2nd, the police arrested Greene at a friend's house.

## II. ISSUES

Greene raises the following issues:

## A. Trial Issues

1. Whether the trial court committed reversible error by allowing Johnson's wife to testify regarding Johnson's moral values;

2. Whether the trial court committed reversible error in denying appellant's motion for a directed verdict as to count three, robbery;

3. Whether the evidence was sufficient to sustain a conviction for kidnapping;

4. Whether the felony murder conviction cannot stand because the predicate felony convictions are invalid;

5. Whether the trial court committed reversible error by allowing the state to elicit testimony concerning letters Greene wrote after his arrest to Tom Bevan and Joseph Fausto (a.k.a."Dr.G.Jones").

## B. Sentencing Issues

1. Whether the trial court committed reversible error by admitting into evidence and relying upon in the aggravation/mitigation hearing a letter Greene wrote to Christina George after his conviction;

2. Whether the imposition of the death penalty was improper;

3. Whether the trial court committed reversible error by imposing aggravated consecutive sentences on the noncapital offenses;

## III. ANALYSIS

### A. Trial Issues

#### 1. WIDOW'S TESTIMONY

■ ¶9 Greene claims the trial court erred by failing to limit Johnson's widow's testimony to the specific character trait of heterosexuality. The state recalled Mrs. Johnson to rebut the testimony of Greene's former girlfriend who testified that Greene had told her that he killed Johnson in response to a homosexual advance. Mrs. John-

son testified that Greene's claim "was preposterous.... [Johnson] was a man of great honor and integrity, of great moral principle, of deep, abiding faith. And most importantly, he was devoted to me as I was to him." Tr. of Mar. 12, 1996, at 92.

¶10 Greene agrees that once a victim's sexual preference is put in issue, the state may offer rebuttal evidence regarding the victim's heterosexuality. *See State v. Rivera,* 152 Ariz. 507, 518, 733 P.2d 1090, 1101 (1987); *see also* Rule 404(a)(2), Ariz. R. Evid. But accusing a married person of making a nonspousal sexual advance places far more than sexual preference in issue. All sorts of character issues are implicated, such as fidelity, integrity, honesty, trustworthiness, and loyalty. Thus, for purposes of rebuttal, Greene's accusation implicated all of these.

■ ¶11 Mrs. Johnson's testimony that her husband was devoted and faithful to her tends to show that the victim would not have made sexual advances toward Greene. Her testimony that he was a man of honor, integrity, and good moral character directly rebuts Greene's accusations of Johnson's infidelity.[1] Admission of the testimony in question was proper rebuttal evidence. Rule 404(a)(2), Ariz. R. Evid. There was no error.

#### 2. SUFFICIENCY OF THE EVIDENCE–ROBBERY

■ ¶12 Greene moved for a directed verdict arguing that there was "no substantial evidence to warrant a conviction" on the robbery count. Rule 20(a), Ariz. R.Crim. P. Substantial evidence is proof that a rational trier of fact could find sufficient to support a conclusion of guilt beyond a reasonable doubt. *State v. Murray,* 184 Ariz. 9, 31, 906 P.2d 542, 564 (1995). We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant. *State v.*

---

1. Greene also argues that the trial court erred by allowing a friend of the Johnson family to testify at the aggravation/mitigation hearing that Johnson "was a decent family man." Tr. of Aug. 22, 1996, at 34. This testimony was relevant to rebut Greene's continued accusations of John-

son's infidelity and homosexuality. There was no error. *See* Rule 404(a)(2), Ariz. R. Evid.; Rule 26.7(b), Ariz. R.Crim. P.("[A]ny party may introduce any reliable, relevant evidence, including hearsay, in order to show aggravating or mitigating circumstances....").

*Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

¶ 13 A person commits robbery if, in the course of taking property of another from his person or immediate presence and against his will, he or she uses force with the intent to coerce the surrender of property or to prevent resistance. A.R.S. § 13–1902(A)(1989). Greene argues that there is no direct evidence that he intended to take the victim's property at the time he used force. He argues that he killed Johnson in response to the homosexual overture, dumped the body, and only then decided to steal his car and wallet. For these reasons, Greene claims his circumstances were similar to those in *State v. Lopez,* 158 Ariz. 258, 762 P.2d 545 (1988), where this court overturned a robbery conviction because of insufficient evidence.

¶ 14 Greene's reliance on *Lopez* is misplaced. Unlike Greene, the *Lopez* defendants discarded the victim's wallet and burned his car after the murder "for the purpose of removing themselves from the scene, to attempt to prevent or delay identification of the body, and to destroy evidence." *Id.* at 264, 762 P.2d at 551. Thus, there was no evidence that the earlier use of force against the victim was accompanied by an intent to commit a robbery. *Id.* Here, Greene was hungry, tired, and craving methamphetamine when he encountered Johnson. He had been thrown out of his temporary residence, had no transportation, and was seeking to avoid a drug dealer who had threatened to shoot him. After stealing Johnson's car, and within hours after killing him, he began spending Johnson's money and using his credit cards.

¶ 15 The examination of the crime scene revealed only one set of tire tracks and footprints to and from the wash. A rational trier of fact could have found beyond a reasonable doubt that Greene's use of force against Johnson was accompanied by an intent to take Johnson's property. The Rule 20 motion was properly denied.

### 3. SUFFICIENCY OF THE EVIDENCE–KIDNAPPING

¶ 16 Greene next argues that a rational trier of fact could not have found beyond a reasonable doubt that he knowingly restrained Johnson with the intent to inflict death, physical injury, or a sexual offense on the victim, or to otherwise aid in the commission of a · felony. *See* A.R.S. § 13–1304(A)(3)(1989).

¶ 17 Nothing in the record tells us how Greene got into Johnson's car. The car was not damaged in any way. Although Greene apparently used a heavy flat object to kill Johnson, nothing indicates whether he found this object in the car, or carried it with him. Moreover, no evidence demonstrates that Greene, while in the car, knowingly restrained Johnson before bludgeoning him, or whether he simply chose to strike him at an opportune moment.

¶ 18 Although it seems highly probable that at some point Johnson was restrained before death, the evidence is insufficient to support such a finding beyond a reasonable doubt. Thus, we reverse the kidnapping conviction and order the entry of a judgment of acquittal on the kidnapping charge.

### 4. FELONY MURDER

¶ 19 Greene argues that we must reverse the felony murder conviction because the convictions for robbery and kidnapping cannot stand. Although we reverse the kidnapping conviction, the robbery conviction remains as a sufficient predicate crime to affirm Greene's felony murder conviction. *See* A.R.S. § 13–1105(A)(2)(Supp.1997). Because Greene admitted that he killed Johnson, *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L. Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), are satisfied. In · addition, we note that Greene was also convicted of premeditated murder.

### 5. POST–ARREST LETTERS

¶ 20 Greene argues that the court erred when it permitted the state to cross-examine him about two letters he wrote after his arrest: one to Joseph Fausto (a.k.a."Dr.

G.Jones") and the other to Tom Bevan. Greene claims the contents of the letters amounted to irrelevant and impermissible "other acts" evidence under Rule 404(b), Ariz. R. Evid.

¶ 21 Greene's argument fails because the letter to Bevan was relevant to show Greene's consciousness of guilt. *See* Rule 401, Ariz. R. Evid. In the letter, Greene indicated that he had reviewed Bevan's recorded statement to authorities, yet nowhere in the letter did Greene challenge the truth of Bevan's statement. Greene was concerned only about Bevan informing on him.

¶ 22 The letter to Fausto is also relevant because it rebuts claims that Greene felt remorse for committing the charged offenses: "Looks like I been a baaaad boy. Fuck it! I always did like to stir shit! The fucker wanted to pay me to have sex with him ... Oops ... sorry faggot, wrong white boy!" Tr. of Mar. 13, 1996, at 155. In addition, the letter contains statements relevant to Greene's claim that he hit Johnson with only his fists: "Coroner's report said multiple skull fractures, and cause of death blunt force trauma. Sounds to me like he got his fuckin' skull caved in!" *Id.* at 156, 107 S.Ct. 1676.

¶ 23 Moreover, the letters were not "other acts" evidence introduced for the purpose of proving that Greene acted in conformity with them. *See* Rule 404(b), Ariz. R. Evid. The letters were direct evidence that Greene committed the charged offense. There was no error.

## B. SENTENCING ISSUES

### 1. GEORGE LETTER

¶ 24 Approximately two weeks after his convictions, Greene, at the request of another inmate, wrote a threatening letter to an inmate named Christina George. Greene argues that the court erred in admitting this letter at sentencing because it was not relevant, or, if relevant, its probative value was substantially outweighed by the danger of unfair prejudice. *See* Rules 401, 402, 403, Ariz. R. Evid.

¶ 25 Although the court admitted the entire letter, it relied on only the following:

Mother fuckin' snitch's rank right up there with child molesters & homosexuals. And if you have seen the news lately then you probably got a pretty good idea as to how I feel about faggots!

. . . .

Very sincerely yours,

  Beau Greene

  convicted murderer

  death row alley

  4–D–25

State's Ex. 1. These statements create inferences relevant to a finding of an especially heinous or depraved state of mind. *See* A.R.S. § 13–703(F)(6)(Supp.1997); *State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992)("In determining whether a crime is heinous or depraved we focus on the defendant's mental state and attitude as evidenced by his words and actions."). The letter was probative of Greene's attitude about the murder and provides insight into his callous fascination with being a "convicted murderer," apparently headed for death row. Moreover, the probative value of these statements is not substantially outweighed by the danger of unfair prejudice. *See* Rule 403, Ariz. R. Evid. There was no error.

## 2. PROPRIETY OF THE DEATH SENTENCE

¶ 26 In capital cases, we independently review the trial court's findings of aggravating and mitigating circumstances to determine if the death penalty is appropriate. A.R.S. § 13–703.01(A)(Supp.1997). The trial court found that the murder was committed for pecuniary gain, A.R.S. § 13–703(F)(5)(Supp.1997), and in an especially heinous, cruel or depraved manner, A.R.S. § 13–703(F)(6)(Supp.1997).

### a. Pecuniary Gain

¶ 27 The aggravating factor of pecuniary gain is present when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5)(Supp.1997). The evi-

dence must show that financial gain was a motive for the murder. *State v. Soto–Fong,* 187 Ariz. 186, 208, 928 P.2d 610, 632 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1826, 137 L.Ed.2d 1033 (1997).

¶ 28 The trial court found that the medical testimony and the crime scene evidence completely negated Greene's version of the killing. According to the medical examiner, Greene could not have fractured Johnson's skull with his fists. Further, the medical examiner testified that a heavy flat object was used to kill Johnson. The use of an instrument implies premeditation. It also undermines Greene's account, and, therefore, his credibility. Likewise, evidence at the crime scene reveals the falsity of Greene's proffered motivation for the killing. The single set of tire tracks and footprints near the wash indicates that Greene did not return for Johnson's wallet as he claims, but instead had the wallet with him when he left the wash immediately following the murder.

¶ 29 The trial court's finding that Greene intended to profit from the murder was also supported by Greene's admitted need for money, drugs, and transportation. Greene testified that he was hungry, tired, and craving methamphetamine when he encountered Johnson. He was homeless, had no transportation, and was attempting to avoid a drug dealer who had threatened to shoot him over an outstanding debt. Greene testified that the two most important things in his life at the time were to get more drugs and to win back his girlfriend.

¶ 30 Greene's actions after the murder also demonstrate a pecuniary motive. Driving Johnson's car, and within hours of the murder, Greene began using Johnson's credit cards. Greene wrapped his hand in K–Y jelly and gauze and feigned injury to explain any discrepancy in credit card signatures. With the stolen credit cards, he purchased camping equipment, food, and electronic equipment that he later traded for drugs. He also bought food and took it to his girlfriend's house for her son.

¶ 31 Greene argues the court failed to properly consider the effect of his methamphetamine use on his ability to accurately perceive and recall the events that night. But if Greene's memory is suspect, all that remains is uncontradicted evidence offered by the state. Moreover, during trial, Greene recalled, in great detail, events both before and after the murder. On cross examination, he stated unequivocally that neither usage nor withdrawal from methamphetamine had ever affected his memory.

¶ 32 We have held that when one comes to rob, the accused expects pecuniary gain and this desire infects all other conduct. *See State v. Landrigan,* 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993). The evidence supports beyond a reasonable doubt a finding that Greene, coming off of methamphetamine and penniless, killed Johnson to obtain cash or credit cards so that he could make fraudulent purchases to exchange for money or drugs. Thus, the trial court found that Greene's admitted need for money, drugs, and transportation in combination with the crime scene evidence showed that Greene intended to profit from the murder no later than the moment he picked up the object to kill Johnson. We agree. Greene murdered Johnson for pecuniary gain.

**b. Especially Heinous or Depraved**

¶ 33 The trial court also found that the murder was especially heinous or depraved under the (F)(6) aggravating circumstance. The terms "heinous" and "depraved" focus on the defendant's state of mind at the time of the offense. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 178, 800 P.2d 1260, 1286 (1990). We have said that "[t]he especially heinous, cruel, or depraved circumstance is phrased in the disjunctive, so if any one of the three factors is found, the circumstance is satisfied." *State v. Murray,* 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995). Factors we consider in determining whether a murder was especially heinous or depraved include: (1) relishing of the murder; (2) gratuitous violence; (3) mutilation; (4) senselessness; (5) helplessness; and (6) witness elimination. *See State v. Ross,* 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994); *see also State v. Gretzler,* 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11 (1983). In this case, the trial

court found relishing, senselessness, and helplessness.

■ ¶ 34 "Relishing" refers to words or actions "that show debasement or perversion." *State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The defendant must say or do something that indicates he savored the murder. *Id.* The court found relishing based on a statement Greene made to Tom Bevan along with Greene's later display of the victim's license to Bevan, and letters he wrote while incarcerated.

### (1) Statement to Bevan

■ ¶ 35 When Greene arrived at Bevan's trailer, he told Bevan that he had "clubbed" a "faggot." The court conceded that Greene may simply have been "relating, in perhaps his vulgar vernacular, an explanation of his conduct." Tr. of Aug. 26, 1996, at 7. The state argues, however, that this language is enough like the language used in *State v. West*, 176 Ariz. 432, 862 P.2d 192 (1993), to support a finding of relishing. We disagree.

¶ 36 West told people he "beat the fuck out of some old man." *Id.* at 448, 862 P.2d at 208. He "bragged about cuts and bruises on his hand coming from beating up 'the old man he ripped off.'" *Id.* Moreover, West boasted of the murder repeatedly and to different friends in detail. He told one friend that " 'he had beat this old man up and tied his arms and legs behind his back and threw him in the closet and then he ripped his stuff off and the car.'" *Id.* at 437, 862 P.2d at 197. While the facts of the instant case are close to those in *West*, they do not reach the level necessary to support a finding of relishing.

### (2) Display of Driver's License

■ ¶ 37 The trial court also gave weight to the fact that Greene "displayed" Johnson's driver's license to Bevan. The court believed that Greene was exhibiting a "trophy souvenir of Roy Johnson's murder" amounting to "proof of his kill." Tr. of Aug. 26, 1996, at 7. A souvenir taken from a crime may constitute relishing. *See, e.g., State v. Clark*, 126 Ariz. 428, 437, 616 P.2d

888, 897 (1980)(saving spent bullet from crime); *State v. Lambright*, 138 Ariz. 63, 75, 673 P.2d 1, 13 (1983) (wearing a necklace with a charm that had belonged to victim), *overruled on other grounds by Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992). These facts, however, do not support such a conclusion.

¶ 38 Greene claims he "displayed" the license to counter Bevan's disbelief. Bevan's trial testimony is consistent with this account:

Q: What was your reaction when he said [he may have killed a guy] to you?

A: I did not really believe it at the time, no.

. . . .

Q: You indicated to us, sir, that you had actually held the driver's license. Was there a reason that you picked that up and held it?

A: No, he just handed it to me so I looked at it.

Q: Did he tell you why he was handing it to you?

A: No.

Q: Did he make any statements to you while he handed you the driver's license?

A: No.

Based on this testimony, we are not convinced that Greene was displaying the license as a trophy or indicating his enjoyment of the crime.

### (3) Post–Arrest Letters

■ ¶ 39 The trial court believed that letters Greene wrote following his arrest demonstrate relishing. The general rule is that a "[d]efendant's state of mind may be inferred from behavior at or near the time of the offense." *State v. Martinez–Villareal*, 145 Ariz. 441, 451, 702 P.2d 670, 680 (1985). Post-murder behavior is relevant to prove heinousness or depravity when it provides evidence of "a killer's vile state of mind *at the time of the murder* . . . ." *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983)(emphasis added). Thus, post-murder statements suggesting indifference, callousness, or a lack of remorse constitute "relishing," only when they indicate, beyond a reasonable doubt,

that the killer savored or enjoyed the murder at or near the time of the murder.

#### (a) Fausto Letter

¶ 40 About one month after his arrest, Greene wrote to his friend Joseph Fausto (a.k.a."Dr.G.Jones"). The trial court noted that in the letter Greene had "no qualms about stating that he is the 'wrong white boy' to be picked up by a 'faggot' who ended up with 'his fuckin' skull caved in.'" Tr. of Aug. 26, 1996, at 7. The court concluded that Greene was "brag[ging] about his conduct because he enjoyed caving in the victim's skull." *Id.* We agree that the statements constitute bragging and show a tremendous lack of remorse. In some cases, bragging about a crime is sufficient proof of relishing where the defendant's statements provide clear insight into his state of mind at the time of the killing. *See, e.g., State v. West,* 176 Ariz. 432, 862 P.2d 192 (1993); *State v. Runningeagle,* 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993) (finding relishing where defendant laughed as he returned to the car after the murder and bragged that he had been in a "good fight"). We do not believe, however, that Greene's statements show beyond a reasonable doubt that he actually enjoyed the killing, or reveal his state of mind at or near the time of the killing.

#### (b) George Letter

¶ 41 The court also relied upon a letter Greene wrote to Christina George, an inmate, about two weeks after he was convicted, but before sentencing. In its finding, the court noted that Greene placed the words "convicted murderer" and "death row alley" on the lines below his signature, and concluded that because he was "look[ing] forward to the notoriety of his death, there is no doubt he relished Roy Johnson's." Tr. of Aug. 26, 1996, at 8. Although Greene's anticipation that he would be sentenced to death reflects extraordinary callousness and lack of remorse, it does not provide sufficient insight as to whether he relished the killing at or near the time he killed. Moreover, the relative remoteness of the George letter persuades us that the state did not prove relishing beyond a reasonable doubt.

¶ 42 We find that the statement and letters certainly demonstrate Greene's vile state of mind and callous attitude toward the murder. Nevertheless, they do not show that Greene relished the murder beyond a reasonable doubt. Absent a finding of relishing, the (F)(6) aggravator cannot stand, because senselessness and helplessness, without more, are ordinarily insufficient to prove heinousness or depravity. *See State v. Ross,* 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994).

#### c. Statutory Mitigation

¶ 43 The trial court did not find any of the mitigating factors set forth in A.R.S. § 13–703(G) (Supp.1997). Greene disputes only the trial court's (G)(1) finding. Greene argues that the trial court erred by failing to find that due to his drug use, his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired."

¶ 44 Greene testified that at the time of the murder he was withdrawing from drugs. Other than his own statement, Greene presented no evidence of the effect the withdrawal had on his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law at the time of the offense.

¶ 45 To the contrary, Greene's behavior shows that he did appreciate the wrongfulness of his conduct. After the murder, Greene asked Bevan for clean pants and shoes. Because Bevan did not have pants for him, Greene rubbed dirt on the bloodstains, "trying to be as inconspicuous as possible." Tr. of Mar. 13, 1996, at 104. Greene also took a small rug to cover the bloody car seats. In addition, he feigned injury to his hand in order to use Johnson's stolen credit cards. We agree with the trial court that the evidence is insufficient to establish the existence of the (G)(1) mitigating circumstance. Furthermore, we agree that Greene failed to establish any of the mitigating factors in A.R.S. § 13–703(G).

#### d. Nonstatutory Mitigation

¶ 46 The trial court considered the following offered mitigation and found it insuffi-

ciently substantial to call for leniency: drug use and withdrawal; dysfunctional family history; lack of felony criminal record; educational achievement; ability to provide for himself and his family, and to have a good marriage and productive life; positive influence on step-brother; and the effect that the execution would have on his children.

### (1) Drug Use and Withdrawal

¶ 47 Evidence showed that Greene had a history of substance abuse dating back to 1983. Despite occasional periods of sobriety, Greene always reverted to heavy use.

¶ 48 In *State v. Jones,* 185 Ariz. 471, 491, 917 P.2d 200, 220 (1996), this court gave "some weight" to evidence of that defendant's history of alcoholism and drug abuse, and his own statement that on the night of the murder he had not slept for three or four days and was under the influence of methamphetamine and alcohol.

¶ 49 Greene's drug use on the days before the murder is undisputed. From Friday, February 24, 1995, until Tuesday, February 28, 1995 (the date of the murder), Greene used methamphetamine every day. During this time he ate very little and did not sleep. Unlike the defendant in *Jones,* however, Greene testified that he was not under the influence of drugs at the time he killed. Nor was there expert testimony of any causal connection between drug use or withdrawal and the offense. *See State v. Rienhardt,* 190 Ariz. 579, 592, 951 P.2d 454, 467 (1997)(rejecting history of substance abuse as a mitigating circumstance when no evidence establishes a causal connection between the drug abuse and the crime). While it is true that Greene killed to get money to buy drugs, this is not the sort of causal connection that would support a claim of mitigation. To hold that a motivation to kill fueled in part by a desire for drugs is mitigating would be anomalous indeed. We reject this claimed mitigating circumstance.

### (2) Dysfunctional Family History

¶ 50 Greene's parents separated when he was thirteen, and Greene lived primarily with his father, a trapper, who migrated between Arizona and Washington. During this time,

he had little formal education. In 1983, when he turned seventeen, he moved back to Washington to live with his mother. Greene's mother testified that she was "hog wild" and "into the drugs and the drinking and the partying" when Greene returned. Tr. of July 29, 1996, at 47. She admitted contributing to Greene's problems with methamphetamine.

¶ 51 This court has held that "family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct." *State v. Towery,* 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996), *cert. denied,* 519 U.S. 1128, 117 S.Ct. 985, 136 L.Ed.2d 867 (1997). Greene's mother introduced him to methamphetamine, and encouraged, or at least failed to discourage, his use through her own open and flagrant use. But because adults have personal responsibility for their actions, adult offenders have a difficult burden of proving a connection between family background and offense-related conduct. *See State v. Stokley,* 182 Ariz. 505, 524, 898 P.2d 454, 473 (1995). At the time of the murder, Greene was 29 years old; he had had little or no contact with his mother in years. Greene's mother may have introduced him to drugs, but Greene failed to show how this influenced his behavior on the night of the murder. *See Towery,* 186 Ariz. at 189, 920 P.2d at 311. Thus, we do not find Greene's dysfunctional family history to be a mitigating circumstance.

### (3) Lack of Felony Criminal Record

¶ 52 We have said that the "[L]ack of prior felony convictions may constitute a nonstatutory mitigating circumstance." *Stokley,* 182 Ariz. at 523, 898 P.2d at 472. Although Greene has no prior felony convictions, he has a 1986 misdemeanor conviction for theft. We agree with the trial court that Greene's lack of a felony conviction is a mitigating circumstance, but entitled to little weight.

### (4) Educational Achievement

¶ 53 Greene received his G.E.D. in 1985. In 1989, he obtained a degree from

the Motorcycle Mechanics Institute, specializing in Harley–Davidson repair. Although we find this educational achievement to be slightly mitigating, *see State v. Hensley,* 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984)(obtaining G.E.D. is mitigation), it is not sufficiently substantial to overcome the aggravator in this case. *See id.; see also Murray,* 184 Ariz. 9, 45, 906 P.2d 542, 578 (1995) (earning high school diploma and becoming a paralegal was not sufficiently substantial mitigation to overcome aggravator).

### (5) Good Marriage and Productive Life

¶ 54    Greene met his ex-wife in January of 1989, and married her in November of that same year. From 1989 until sometime in 1993, he fathered two children, completed trade school, and was employed.

¶ 55    We have found mitigation where the defendant was an adequate family member, *see State v. Stanley,* 167 Ariz. 519, 529, 809 P.2d 944, 954 (1991), but refused to find mitigation where the defendant had maintained minimal contact with his child. *See State v. West,* 176 Ariz. 432, 451, 862 P.2d 192, 211 (1993). Sometime after his marriage ended in 1994, Greene's parental rights to his children were severed and his financial support for his children was minimal to nonexistent. He thus did not have a good marriage or healthy family life. We reject this claim of mitigation.

¶ 56    As for leading a productive life, we have found mitigation where the defendant had for some periods been gainfully employed, *State v. Soto–Fong,* 187 Ariz. 186, 211, 928 P.2d 610, 635 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 1826, 137 L.Ed.2d 1033 (1997), and refused to find mitigation where the defendant was unable to hold down a job for any significant period and was frequently unemployed, *State v. Spears,* 184 Ariz. 277, 294, 908 P.2d 1062, 1079 (1996). Greene was unemployed at the time of the murder and failed to provide evidence of gainful employment after trade school in 1990. We reject this mitigating circumstance.

### (6) Positive Influence on Step–Brother

¶ 57    Greene's step-brother, a middle school teacher, testified that Greene taught him new perspectives and self-reliance. Although past good conduct and character is a relevant mitigating circumstance, *see State v. Williams,* 183 Ariz. 368, 384, 904 P.2d 437, 454 (1995), a single good deed, removed in time from the crime, does not rise to that level and is not mitigating. *See State v. Willoughby,* 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995) (finding a "great number" of past good deeds to have mitigating value).

### (7) Effect of Execution on Greene's Children

¶ 58    Greene's ex-wife testified that she was concerned about the effect Greene's execution would have on her children. We give some mitigating weight to the effect Greene's execution would have on the emotional well-being of his children. *See State v. Maturana,* 180 Ariz. 126, 135, 882 P.2d 933, 942 (1994).

### (8) Additional Arguments

¶ 59    Greene submits two additional mitigating factors not found by the trial court: (1) Greene is remorseful, and (2) Greene is capable of rehabilitation. Any claims of remorse are completely negated by Greene's vile state of mind, as shown by letters Greene wrote long after the offense, and at a time when he was not using drugs. Nor has Greene presented any evidence that he is capable of rehabilitation. We reject both of these factors.

### e. Independent Reweighing

¶ 60    We independently review the trial court's findings of aggravation and mitigation, and if an error is made, we independently determine if the mitigation is sufficiently substantial to warrant leniency in light of existing aggravation. A.R.S. § 13–703.01 (Supp.1997). In weighing, we consider the quality and the strength, not simply the number, of aggravating and mitigating factors. *See State v. McKinney,* 185 Ariz. 567, 578, 917 P.2d 1214, 1225 (1996). Although we have rejected the (F)(6) finding,

leaving pecuniary gain as the sole aggravator, upon independent reweighing we conclude that the mitigation, considered individually and collectively, is not sufficiently substantial to warrant leniency. We have a very strong (F)(5) here, with relatively trivial nonstatutory mitigation.

### 3. IMPOSITION OF AGGRAVATED SENTENCES

■ ¶ 61 Based on findings of "pecuniary gain" and a "heinous or depraved" state of mind, the trial court imposed aggravated sentences on the robbery, kidnapping, and theft-by-control convictions. Greene claims that because these findings are either an essential element of, or irrelevant to, the offenses in question, the trial court erred in relying upon them.

¶ 62 But an element of a crime can also be used for enhancement and aggravation purposes. See State v. Lee, 189 Ariz. 608, 620, 944 P.2d 1222, 1234 (1997), cert. denied, —— U.S. ——, 118 S.Ct. 1192, 140 L.Ed.2d 321 (1998) (citing State v. Lara, 171 Ariz. 282, 285, 830 P.2d 803, 806 (1992)). Pecuniary gain is an aggravating circumstance in determining a robbery sentence. See id. at 620–21, 944 P.2d at 1234–35. A.R.S. sections 13–702(C)(5) (heinous, cruel or depraved), and (C)(6) (pecuniary gain) require the trial court to consider these factors in sentencing on the noncapital convictions. There is no error here.

### IV. DISPOSITION

¶ 63 We affirm Greene's convictions and sentences for first degree murder, robbery, theft, and forgery,[2] including the sentence of death. We reverse the conviction for kidnapping and order that a judgment of acquittal be entered on that count.

JONES, V.C.J., and MOELLER, J. (retired), concur.

ZLAKET, Chief Justice, dissenting.

¶ 64 In State v. Watson, 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981), this court plainly stated:

> We believe Godfrey v. Georgia, [446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)], mandates that the death penalty should be reserved for only the most aggravating of circumstances, circumstances that are so shocking or repugnant that the murder stands out above the norm of first degree murders, or the background of the defendant sets him apart from the usual murderer.

In my opinion, there is nothing about Beau John Greene or his crime that meets this constitutional standard.

¶ 65 It is sad, but true, that the tragic and reprehensible killing of Professor Johnson is not much different from other "robbery gone awry" murders that come to us. Moreover, there has been no clear showing that the defendant rises above "the norm" of other similarly convicted offenders. I am persuaded that had this court not so ill-advisedly elected to abandon proportionality reviews in capital cases, see State v. Salazar, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992), the inconsistency and arbitrariness of this death penalty would instantly become obvious.

¶ 66 "The United States Constitution demands that imposition of a death sentence be based upon some principled distinction." State v. Mata, 185 Ariz. 319, 323, 916 P.2d 1035, 1039 (1996), cert. denied, 518 U.S. 1045, 117 S.Ct. 20, 135 L.Ed.2d 1114 (1996). Aggravating circumstances must "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano v. Florida, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984); see also Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) ("[A] State's capital sentencing scheme also must 'genuinely narrow the class of persons eligible for the death penalty.'") (quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77

---

**2.** An automatic notice of appeal in a capital case is sufficient as a notice of appeal with respect to all judgments entered in the case. Rule 31.2(b), Ariz. R.Crim. P. Greene does not contest the theft and forgery convictions on appeal, and thus they are automatically affirmed.

L.Ed.2d 235 (1983)). Put differently, constitutionally permissible aggravators must "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742 (1983), *quoted in Romano v. Oklahoma*, 512 U.S. 1, 7, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1 (1994).

¶ 67 The majority admits that the trial court's (F)(6) finding is unsustainable. That leaves (F)(5), "pecuniary gain," as the sole aggravator in this matter. In recent years, we have acknowledged that statutory aggravating factors are not entitled to the same weight in every case. For example, we have stated that because there are varying degrees of cruelty, heinousness and depravity, the (F)(6) aggravator may be accorded greater or lesser significance when weighed against available mitigation in a given situation. *See, e.g., State v. Miller*, 186 Ariz. 314, 327–28, 921 P.2d 1151, 1164–65 (1996) (affirming the trial court's holding that four mitigators were outweighed by a single aggravator of heinous, cruel or depraved), *cert. denied*, 519 U.S. 1152, 117 S.Ct. 1088, 137 L.Ed.2d 221 (1997); *State v. Barreras*, 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995) (stating that the weighing process "requires an evaluation of the strength and quality of both the aggravating and mitigating evidence"); *State v. Gulbrandson*, 184 Ariz. 46, 71, 906 P.2d 579, 604 (1995) (holding that, because the killing was "particularly gruesome, brutal, and protracted," the "finding of gratuitous violence [was] entitled to great weight"). While the foregoing principle is logical, the subjectivity inherent in its application tends to expose the fragile constitutional underpinnings of our capital sentencing scheme. Nowhere is this more obvious than in our treatment of the "pecuniary gain" aggravator.

¶ 68 The details of murder are never pleasant. Most, in fact, are quite detestable.

It cannot be doubted, however, that some homicides are worse than others. The same may be said of killers—as with all human beings, no two are exactly alike. The determination of who shall live and who shall die must be based on something more definite and predictable than the visceral reaction to a particular crime and/or defendant. Viewing the facts of the instant case in the context of our capital jurisprudence, I struggle to make sense of this death sentence. I worry that it may have been precipitated in part by the prominence of the victim in his community, as well as insulting and inflammatory remarks made by the defendant long after the crime. These are matters that do not constitute aggravating circumstances under our capital sentencing laws.

¶ 69 I agree that the facts here support the (F)(5) aggravator as we now interpret it, even though there was once considerable disagreement as to its meaning.[1] However, just as there are varying degrees of cruelty, heinousness and depravity, not all killings for pecuniary gain are the same. Consequently, they should not be given the same weight in the sentencing calculus. I believe our case law plainly reflects this principle.

¶ 70 Although (F)(5) is present in many capital sentencings, it is uncommonly seen as the sole aggravator. An examination of those few instances where trial courts have sentenced defendants to death based on this solitary factor is instructive. In *State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988), having found that drugs and alcohol contributed to the defendant's conduct, we reduced his sentence to life. In three other cases, where we affirmed the death sentences, there are striking similarities. In *State v. White*, 168 Ariz. 500, 503–04, 815 P.2d 869, 872–73 (1991) the defendant and his girlfriend conspired to kill her husband to obtain life insurance proceeds. At a predetermined time, the defendant drove to the victim's

---

1. Former Chief Justice Frank X. Gordon believed that the legislature "intended [(F)(5)] only to include the situation where defendant is a hired killer." *State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897 (1980) (Gordon, J., concurring). Thus, "[b]y extending the meaning of [(F)(5)] to the instant case, the majority has included a killing in the perpetration of a robbery as an aggravating circumstance. The Legislature, had it so intended, could have accomplished this result with more precise, specific language." *Id.; see also State v. Willoughby*, 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995) (noting that a concern for contract killings "may have prompted the promulgation of § 13–703(F)(5)").

house and, using a potato-silencer on his gun, shot and killed him. *Id.* The Defendant and his girlfriend later discussed collecting the insurance money. In *State v. Willoughby*, 181 Ariz. 530, 533–34, 892 P.2d 1319, 1322–23 (1995), the defendant convinced his wife to take out large insurance policies naming him as the beneficiary. After numerous meetings, he and his girlfriend agreed upon an elaborate and detailed murder plan that they later executed. *Id.* at 534, 892 P.2d at 1323. Shortly after killing his wife, the defendant filed insurance claims. In *State v. Spears*, 184 Ariz. 277, 908 P.2d 1062 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 393, 136 L.Ed.2d 308 (1996), the victim considered the defendant to be her boyfriend. Relying on this, he devised a plan to take her money and vehicle. *Id.* at 282, 908 P.2d at 1067. The victim took a leave of absence from work, apparently believing she was taking a trip with the defendant. During this "trip," she obtained substantial cash advances, purchased things for him, and signed over her vehicle title. Her body was found in the desert with a gunshot wound to the back of the head. *Id.* at 283, 908 P.2d at 1068.

¶ 71 In affirming the sentences in these cases, we emphasized the carefully conceived and meticulously prepared plans. For example, in *Willoughby* we said:

> This killing was not just the result of momentary premeditation but of Defendant's deliberate, carefully conceived, meticulously planned, and cold-blooded scheme to kill, rather than divorce, his unsuspecting wife. In this respect it was very much like the cold and callous contract killing that may have prompted the promulgation of § 13–703(F)(5).

181 Ariz. at 549, 892 P.2d at 1338; *see also White*, 168 Ariz. at 516, 815 P.2d at 885 (stating that "there is a difference between the taking of human life with exacting, premeditated coolness, as here, and the hasty, impulsive taking of life that evolves from other criminal activity"); *Spears*, 184 Ariz. at 295, 908 P.2d at 1080 ("This premeditated murder of the prey was carefully planned and calculated for the lucre which resulted.").

¶ 72 In the present matter, there is no evidence of substantial planning. Greene's decision to kill may have been "as instantaneous as successive thoughts of the mind," *State v. Eastlack*, 180 Ariz. 243, 259, 883 P.2d 999, 1015 (1994), or it may have developed over the course of an hour or two. We simply cannot know. It is clear, however, that even the most generous reading of the state's evidence fails to uncover planning or scheming remotely comparable to that in the above cases.

¶ 73 We have at times reduced death sentences to life where, as here, the trial court identified multiple aggravators, but on review all were eliminated except the pecuniary gain factor. *See State v. Rockwell*, 161 Ariz. 5, 775 P.2d 1069 (1989) (defendant killed an employee at a truck stop during a robbery); *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983) (defendant took a rifle to victim's house intending to rob, and killed victim when he answered the door). In *State v. Marlow*, 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989), we upheld two of three aggravators, including pecuniary gain, but weighed them only once because they were based on the same facts. We then reduced the sentence.

¶ 74 Where death sentences have been affirmed, the facts are generally worse than those presented here. As we noted in *State v. McKinney*, "[w]e have encountered pecuniary gain as the sole aggravator in other cases in which the death penalty was not imposed, but the quality of [Defendant] Hedlund's conduct in this case certainly gives great weight to the aggravating circumstance." 185 Ariz. 567, 584, 917 P.2d 1214, 1231 (1996) (citations omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 310, 136 L.Ed.2d 226 (1996). That conduct involved two murders committed during a carefully planned burglary spree in which "[t]he possibility of murder was discussed and recognized as being a fully acceptable contingency." *Id.; see also State v. Hensley*, 142 Ariz. 598, 691 P.2d 689 (1984) (planned robbery involving a double murder to eliminate witnesses).

¶ 75 Once the weight of each aggravator and mitigator has been assessed, we are obligated to balance the factors against each other to decide whether leniency is appropriate. *See* Karen L. Hinse, Note, *Appellate Review of Death Sentences: An Analysis of*

*the Impact of Clemons v. Mississippi in Arizona,* 34 Ariz. L.Rev. 141, 142 n. 11 (1992). As previously indicated, our cases have stated unequivocally that "[w]e will not uphold imposition of the death penalty unless either the murder or the defendant differs from the norm of first degree murders or defendants." *State v. Fierro,* 166 Ariz. 539, 548, 804 P.2d 72, 81 (1990); *see also Spears,* 184 Ariz. at 295, 908 P.2d at 1080. Furthermore, we have long "adhere[d] to the principle that 'where there is a doubt whether the death penalty should be imposed, we will resolve that doubt in favor of a life sentence.'" *Marlow,* 163 Ariz. at 72, 786 P.2d at 402 (quoting *Rockwell,* 161 Ariz. at 16, 775 P.2d at 1080). In the present case, it seems to me that these principles are honored only in their breach.

¶ 76  In *Gregg v. Georgia,* the Supreme Court noted the two social purposes purportedly served by capital punishment: "retribution and deterrence of capital crimes by prospective offenders." 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976). In *Enmund v. Florida,* the Court stated that unless the death penalty "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) (quoting *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977)). Stated differently, "[w]hat 'reasonably justif[ies]' selection of a particular subgroup of defendants is that these defendants, or their crimes, are the 'worst' murderers or murders, meaning the most deserving of retribution, or the most deterrable." Bruce S. Ledewitz, *The New Role of Statutory Aggravating Circumstances in American Death Penalty Law,* 22 Duq. L.Rev. 317, 355 (1984) (alteration in original) (citing *Zant v. Stephens,* 462 U.S. 862, 877 n. 15, 103 S.Ct. 2733, 2742 n. 15, 77 L.Ed.2d 235 (1983)).

¶ 77  Arizona's F(5) aggravator arguably reflects both "a concern with retribution" and "a deterrence rationale." Charles A. Pulaski, Jr., *Capital Sentencing in Arizona: A Critical Evaluation,* 1984 Ariz. St. L.J. 1, 47. But what is it about Defendant Greene or this crime that makes him, among all murderers, "most deserving of retribution?" Ledewitz, *supra,* at 355. The majority does not tell us. It merely asserts, without support in my opinion, that "[w]e have a very strong (F)(5) here." *Supra,* at ¶ 60. As previously noted, trial court sentencing practices over the last decade, as well as our own precedent, suggest the contrary. Because we have no indication that substantial planning was involved in this case, no relationship of trust or confidence between the perpetrator and his victim, and few other details surrounding the crime that were proven beyond a reasonable doubt, I conclude that this aggravator must lie toward the weaker end of the spectrum.

¶ 78  As for deterrence, the majority admits that Greene was hungry, without a place to stay, and withdrawing from a recent methamphetamine binge when he killed Mr. Johnson. It is difficult to imagine' the death penalty having much deterrent effect on someone so situated. *See* Pulaski, *supra,* at 47 (arguing that judges should assess whether "imposing the death penalty would significantly advance the legislative goals implicit in those statutory aggravating circumstances present in the defendant's case"); *Gregg,* 428 U.S. at 185, 96 S.Ct. at 2931 (noting "that there are murderers . . . for whom the threat of death has little or no deterrent effect").

¶ 79  The majority considers nine circumstances as possible nonstatutory mitigation: 1) drug use and withdrawal, 2) dysfunctional family history, 3) lack of felony criminal record, 4) educational achievement, 5) good marriage and productive life, 6) positive influence on step-brother, 7) the effect of execution on Greene's children, 8) remorse, and 9) capability for rehabilitation. It rejects items 1, 2, 5, 6, 8 and 9 altogether, despite the fact that the trial judge expressly found at least two of them (1 and 6) to be mitigating. It acknowledges the presence of items 3, 4 and 7, but describes them as "relatively trivial." *Supra,* at ¶ 60. It accords "little weight" to Greene's criminal history, which is innocuous compared to that of most capital defendants. *Supra,* at ¶ 52.

¶ 80  In contrast, I agree with the trial judge that items 1 and 6 have been proven.

I share the majority's conclusion that items 3, 4 and 7 are present, but place considerably more weight on the defendant's lack of a serious criminal record. In my mind, when this mitigation is collectively considered and balanced against the solitary, relatively weak (F)(5) aggravator, there is considerable doubt as to whether a death sentence is appropriate. *See Marlow,* 163 Ariz. at 72, 786 P.2d at 402.

¶ 81 While I am offended by Greene's letters and agree that they do not support his claim of remorse, I choose not to overemphasize them. Experience and common sense tell us that attitudes expressed in prison may be precipitated by a panoply of motives, influences, pressures and circumstances foreign to the outside world. While we might hope that incarceration spurs killers to openly express remorse, we ought not be shocked when it fails to do so.

¶ 82 No one can deny that evaluating the quality and strength of aggravation and mitigation involves a degree of subjectivity. *See State v. Barreras,* 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995). However, in order to protect the weighing process from "the same unguided, emotional results denounced since *Furman* [*v. Georgia,* 408 U.S. 238, 92·S.Ct. 2726, 33 L.Ed.2d 346 (1972)]," *State v. White,* 168 Ariz. 500, 524, 815 P.2d 869, 893 (1991) (Corcoran, J., concurring), we must attempt to manage our subjective inclinations so that arbitrary rulings are avoided. *See id.* at 523, 815 P.2d at 892 ("If the sentencing judge has no right ... to consider his or her own subjective belief as to the appropriateness of a penalty, we have no greater authority to do so on appeal."). Our precedent is indispensable in this regard, *see* Pulaski, *supra,* at 46 ("One source of guidance is the prior decisions of the Arizona Supreme Court."), and I believe it compels only one result. Although I feel the utmost compassion for the victim and his survivors, and genuinely despise the crime committed by this defendant, I honestly do not believe there is any principled basis under our law upon which to execute him. I would reduce his sentence to life without any possibility of parole.

KLEINSCHMIDT, J., concurs.

Justice Stanley G. Feldman did not participate in the determination of this matter. Pursuant to Ariz. Const. art. VI, § 3, the Honorable Thomas C. Kleinschmidt, Judge of the Arizona Court of Appeals, Division One, was designated to sit in his stead.